## UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

_____

**Patrick Tate Adamiak,**

**Defendant-Appellant,**

**v.**

**No. 23-13062**

**United States of America**

**Plaintiff-Appellee.**

_____

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA AT NORFOLK

---

### BRIEF OF APPELLANT

---

Matthew Larosiere, Esq.
6964 Houlton Circle
Lake Worth, FL 33467
Email: larosieremm@gmail.com
Telephone: 561-452-7575
*Counsel for Appellant*

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Appellant Patrick Tate Adamiak respectfully requests oral argument on this appeal.

## TABLE OF CONTENTS

STATEMENT REGARDING ORAL ARGUMENT ...............................i

TABLE OF CONTENTS ...................................................................ii

TABLE OF AUTHORITIES ...........................................................v

STATEMENT OF JURSIDICTION ...............................................viii

STATEMENT OF THE ISSUES ......................................................1

STATEMENT OF THE CASE ..........................................................2

   **(i)**   **Course of Proceedings and Disposition in the Court Below** ................................................................................. 2

   **(ii)**   **Statement of the Facts** ...............................................6

   **(iii)** **Standards of Review** ...................................................6

SUMMARY OF THE ARGUMENTS ...............................................8

ARGUMENT ...................................................................................10

**I.**    **THE DISTRICT COURT ERRED IN DENYING THE MOTION TO DISMISS THE INDICTMENT** ....................................................10

   **a.**   **Counts 1 and 2: The Indictment Did Not Identify the Elements of the Charged Offense** ................................................11

   **b.**   **The Same Analysis Applies to Counts 3, 4, and 5.** .............17

**II.**   **THE DISTRICT COURT ERRED IN DENYING THE MOTIONS FOR JUDGMENT OF ACQUITTAL** ..............................20

   **a.**   **The District Court Submitted a Critical Question of Law to the Jury** ..............................................................................20

**b.     Counts 1, 2, and 5: The Trial Court Erroneously Dispensed With its Duty of Statutory Interpretation Concerning Destroyed Firearms** ...................................................22

**c.     Counts 1 and 2: No Reasonable Jury, Properly Instructed, Could Have Returned a Conviction As To the PPSH Parts** .....27

  **i.**   Sub-definitions (1), (2), and (3) are inapplicable because a box of inoperable PPSH parts is not a "weapon" ........................................28

  **ii.**    Sub-definition (3) is inapplicable because, in addition to not being a weapon, welding together a critical part is not something that can be done "readily." ................................................................30

  **iii.**    Sub-definition (4) (and indeed the entire section) was not applicable because the PPSH parts did not contain a "frame or receiver." Furthermore, such was not charged in the indictment. ....33

  **iv.**    Sub-definition (7) can not apply because, in addition to not being charged, welding and fabrication is not "assembly." ..............35

**e.     Counts 3, 4, and 5: No Reasonable Jury, Properly Instructed, Could Have Returned a Conviction As To the Alleged Destructive Devices** ...........................................................37

  **i.**   The Government Provided No Evidence the Subject Articles Were "Weapons" ....................................................................39

  **ii.**    Counts 3 and 4: No Reasonable Jury, Properly Instructed, Could Have Returned a Conviction to the M79 or M203 being Weapons Which Can be "Readily Assembled" ..................................41

  **iii.**    Count 5: No Reasonable Jury, Properly Instructed, Could Have Returned a Conviction to the Alleged RPG7s ...........................44

**III.  *STAPLES* AND *MENS REA*: THE GOVERNMENT FAILED TO PROVE THE REQUISITE *MENS REA*** .......................................45

**IV.  THE TRIAL COURT REVERSIBLY ERRED IN IMPROPERLY INSTRUCTING THE JURY** ....................................48

**V.   THE DISTRICT COURT IMPROPERLY APPLIED SENTENCE ENHANCEMENTS AND IMPROPERLY CALCULATED THE BASE OFFENSE LEVEL**.................................54

   **a.   The District Court Improperly Applied a Fifteen-Level Enhancement Under U.S.S.G. § 2K2.1(b)(3)(A).**...........................55

   **b.   Similarly, the District Court Improperly Counted 29 Purported "Firearms" In Calculating the Offense Level**..........56

**VI.   IF THE CHARGED STATUTES COVER APPELLANT'S CONDUCT, THEY ARE UNCLEAR ON THAT POINT AND MUST BE CONSTRUED NARROWLY**............................................57

   **a.   § 5845 (b) and (f) ARE AMBIGUOUS AS APPLIED TO APPELLANT**......................................................57

**VII.   COUNSEL FOR APPELLANT PROVIDED CONSTITUTIONALLY INEFFECTIVE ASSISTANCE AT TRIAL**   59

**VIII.   IF THE CHARGED ITEMS FALL WITHIN § 5845, ITS APPLICATION VIOLATES THE SECOND AMENDMENT**..........61

**CONCLUSION**.......................................................66

**CERTIFICATE OF COMPLIANCE WITH RULE 32(A)**.................67

**CERTIFICATE OF SERVICE**...........................................68

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687 (1995) ................................................................................. 58

*Caetano v. Massachusetts*, 577 U.S. 411 (2016)..................................... 63

*Cargill v. Garland*, 57 F.4th 447 (5th Cir.), *cert. granted*, 144 S. Ct. 374 (2023) ................................................................................... 57

*Chapman v. United States*, 500 U.S. 453 (1991) ................................... 57

*Curley v. Klem*, 499 F.3d 199 (3d Cir. 2007) .......................................... 21

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .............................. 62

*F.J. Vollmer Co., Inc. v. Higgins*, 23 F.3d 448 (D.C. Cir. 1994) ............ 32

*Facebook, Inc. v. Duguid*, 592 U.S. 395 (2021) ..................................... 20

*Geudes v. ATF*, 140 S. Ct. 789 (2020) .............................................. 58, 21

*Jones v. United States*, 526 U.S. 227 (1999) .......................................... 55

Kokin, 365 F.2d 595 (3rd Cir. 1966) ....................................................... 42

*Maracich v. Spears*, 570 U.S. 48 (2013) ................................................. 58

*Miller v. Bonta*, No. 19CV01537BENJLB, 2023 WL 6929336 (S.D. Cal. Oct. 19, 2023) ...................................................................... 63

*Missouri v. Hunter*, 459 U.S. 359 (1983).............................................. 36

*Moskal v. United States*, 498 U.S. 103 (1990) ....................................... 57

*Pullman-Standard v. Swint*, 465 U.S. 273 (1982)................................. 20

*Russell v. United States*, 369 U.S. 749 (1962)........................................ 16

*S.W. Daniel, Inc. By & Through Daniel v. United States*, 831 F.2d 253 (11th Cir. 1987)...................................................................25

*Staples v. United States*, 511 U.S. 600 (1994) ................. 5, 12, 45, 47, 49

*U.S. v. Alverson*, 666 F.2d 341 (9th Cir. 1982) ......................................31

*U.S. v. Dodson¸*519 Fed.Appx. 344, 347 (6th Cir. 2013)........................21

*U.S. v. Doucet*, 994 F.2d 169 (5th Cir. 1993) ........................................15

*U.S. v. Hamrick*, 43 F.3d 877 (4th Cir. 1995)........................................21

*U.S. v. Huff*, 512 F.2d 66 (5th Cir. 1975)..................................................8

*U.S. v. Jaensch*, 665 F.3d 83 (4th Cir. 2011) ...........................................7

*U.S. v. Kindred*, 931 F.2d 609 (9th Cir. 1991) ......................................47

*U.S. v. McCauley*, 601 F.2d 336 (8th Cir. 1979) ...................................31

*U.S. v. Nieves*, 108 Fed. Appx. 790 (4th Cir. 2004)................... 14, 15, 19

*United States v. Benton*, 523 F.3d 424, 435 (4th Cir. 2008) ..................59

*United States v. Blackburn*, 940 F.2d 107 (4th Cir. 1991) ... 38, 44, 45, 54

*United States v. Bolden*, 325 F.35 471 (4th Cir. 2003) ...........................14

*United States v. Brown*, 715 F. Supp. 2d 688 (E.D. Va. 2010) ................7

*United States v. Carter*, 465 F.3d 658(6th Cir. 2006)............................15

*United States v. Crooker*, 608 F.3d 94 (1st Cir. 2010) ........................9, 22

*United States v. Davis*, 313 F.Supp 710 (D.Conn. 1970).......................44

*United States v. Dodson*, 519 F. App'x 344 (6th Cir. 2013) .....................8

*United States v. Gordon*, 895 F.2d 932 (4th Cir. 1990) ..........................56

*United States v. Kuzma*, 967 F.3d 959 (9th Cir. 2020)...........................36

*United States v. Madrigal–Valadez*, 561 F.3d 370 (4th Cir.2009) ........... 7

*United States v. Moye*, 454 F.3d 390 (4th Cir. 2006) ............................. 48

*United States v. Perry*, 757 F.3d 166, (4th Cir. 2014) .............................. 6

*United States v. Posnjak*, 457 F.2d 1110 (2nd Cir. 1972) ...................... 44

*United States v. Smith*, 43 F.3d 1469 (4th Cir. 1994) ........................... 10

*United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505 (1992) .... 26, 27, 42, 43

*United States v. Wonschik*, 353 F.3d 1192 (10th Cir. 2004) ....... 11, 52, 53

*United States v. Zeidman*, 444 F.2d 1051 (7th Cir 1971) ...................... 42

*VanDerStok v. Garland*, 86 F.4th 179 (5th Cir. 2023) ....................... 9, 34

*Winters v. New York*, 333 U.S. 507 (1948) ............................................ 16

*Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293 (11th Cir. 2017) ........... 56

## Other Authorities

2A Charles Alan Wright & Peter J. Henning, Federal Practice and Procedure (4th ed. 2009) ...................................................................... 16

*Merriam-Webster.com Dictionary*, Merriam-Webster, Part, https://www.merriam-webster.com/dictionary/part ............................ 23

The Functions of Judge and Jury in the Interpretation of Statutes, 46 HARV. L. REV. 7 1086 (1933) ..................................................... 19, 20

## **STATEMENT OF JURSIDICTION**

      This appeal arises from a judgment of the district court entered on June 27, 2023. (JA2269).[1] Appellant filed his timely Notice of Appeal in the district court on June 27, 2023. (JA2275). The district court had jurisdiction pursuant to 18 U.S.C. § 3231. This Court has jurisdiction on appeal pursuant to 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

---

[1] References to the record are to the Joint Appendix and are denominated "(JA__)" followed by the designated page number.

## **STATEMENT OF THE ISSUES**

I.   Whether the district court erred in denying the Appellant's motion to dismiss the indictment where the indictment omitted key elements of the offense.

II.  Whether the district court erred in denying the Appellant's motion for judgment of acquittal on charges relating to the transfer and possession of unregistered "firearms" where the purported "firearms" were nonfunctional, incomplete, and disintegrated.

III. Whether the district court erred in refusing to instruct the jury as to the specific *mens rea* requirements to sustain a conviction under the charged conduct.

IV.  Whether the district court erred in instructing the jury as to the entirety of a disjunctive statute where the indictment was silent as to what specific purportedly regulated items it charged.

V.   Whether applying 26 U.S.C. §§ 5841, 5845, 5861, and 5871 to an individual who possessed inert, disintegrated relics violated the Second and Fourteenth Amendments.

## STATEMENT OF THE CASE

**(i)    Course of Proceedings and Disposition in the Court Below**

On May 4, 2022, Adamiak, a U.S. Navy Petty Officer, was charged in an eleven Count Indictment. (JA15-20). Appellant was released on an unsecured bond in the amount of $2,000.00 on April 13, 2022.

An Agreed Order regarding discovery was entered on May 11, 2022. (JA24-28). Paragraph 8 of the Discovery Order required the defendant to disclose to the government "no later than ten business days before trial, a written summary of testimony the defendant intends to use under Rules 702, 703, and 705," (JA26).

Mr. Adamiak filed a Motion To Dismiss Counts 10 and 11 of the Indictment arguing that the two counts were duplicative. (JA29-34). This Motion was granted by Order entered June 6, 2022. (JA34-36).

On June 23, 2022, a Five (5) Count Superseding Indictment was returned, and was the last indictment in the case. (JA37-41). Each count of the superseding indictment was silent as to which definition of "machinegun" or "destructive device" the charge fell under. *Id*.

2

On July 27, 2022 the Government moved *in limine* to preclude an ignorance of the law defense. (JA42-44). Adamiak responded. JA74-76. The District Court granted the Government's Motion. JA103-104.

Adamiak filed a Motion to Dismiss on August 8, 2022. (JA46-73). *Id*. The Government responded. (JA81-90). The District Court denied Adamiak's Motion to Dismiss. (JA91-102).

Counsel for Adamiak served a Notice of Expert Witness to the Government on October 10, 2022 (JA115-117), which was 8 days prior to trial. Adamiak indicated he would call Daniel G. O'Kelly ("O'Kelly") as an expert witness during trial. The bases and reasoning supporting the opinions of O'Kelly were not provided, as required by the Joint Discovery Order.

Courtroom proceedings began on October 18, 2022. Witness testimony began on October 19, 2022. The Government's first witness was William Hairston, a special agent ("SA Hairston") of the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"). SA Hariston testified that he engaged the services of a confidential informant ("CI") in the investigation leading up to the Indictment of Adamiak. (JA371).

3

SA Hairston applied for and executed a search warrant on the two addresses of Adamiak following the purchase of March 23, 2022. (JA392).

SA Hairston testified that items found during the search could be assembled and made into the alleged M79, the basis for Count Three of the Indictment (JA394; JA2308); the M203, the basis for Court Four of the Indictment (JA396; JA2309); and two conspicuously inert RPG-7 projectors (JA400; JA2314).

Ronald K. Davis, ATF Firearms and Ammunition Technology Division ("Agent Davis"), was qualified by the district court as an expert witness in firearms classification, identification and firearm compliance. (JA567-575). Included in his testimony, without objection, was his report, Exhibit 120, which contained legal conclusions beyond the scope of expert testimony. (JA580; JA2454-2464).

Jeff Bodell, ATF Firearms Enforcement Officer (Officer Bodell), was qualified by the district court as an expert witness in the classification and identification of firearms. (JA626-632). Included in his testimony, without objection, was his report, exhibit 121, which contained legal definitions and conclusions beyond the scope of expert testimony. (JA2465-2510).

4

Christopher Schramm, Operations Manager at DOA Arms ("Schramm") testified that DOA Arms was a firearm retailer. Schramm testified that Adamiak had legally purchased the M79 receiver for the device named in Count Three of the Indictment in March, 2022.

At the conclusion of the Government's evidence Adamiak moved for a judgment of acquittal pursuant to Rule 29. The District Court denied the motion. (JA762-774).

After being examined by the District Court regarding his right to testify on his own behalf, Adamiak elected not to testify. (JA774-775).

The jury was then instructed (JA800-824). The Jury returned a verdict of guilty as to all counts contained in the Superseding Indictment. (JA836). After receiving the verdict of guilty, Adamiak renewed his motion for judgment of acquittal. (JA834). The renewed motion was denied by the District Court. (JA834).

Sentencing was scheduled for March 31, 2023 (JA831) and a Sentencing Procedures Order, executed by counsel and Adamiak, was entered October 21, 2022. (JA838-840). Mr. Adamiak remains incarcerated on the judgment and sentence at issue.

5

## (ii)  Statement of the Facts

The items Appellant was charged with were inoperable relics and lawfully possessed collectibles. The PPSH parts of Counts 1 and 2 were entirely disassembled, cut in half, and inoperable. (JA2305). The lawfully acquired receivers that were part of Counts 3 and 4 of the indictment were found locked in a safe, far from any barrels or other parts. (JA2320). The alleged RPG-7s that make up Count 5 of the indictment had holes drilled in the high-pressure area of the tube, were missing critical fire control components, and were conspicuously labeled "INERT" and "TRAINING AID DUMMY" (JA2326; JA2317).

## (iii)  Standards of Review

As to issue I, "[w]e review the district court's factual findings on a motion to dismiss an indictment for clear error, but review its legal conclusions *de novo*." *United States v. Perry*, 757 F.3d 166, 171 (4th Cir. 2014) (cleaned up). "When a criminal defendant challenges the sufficiency of an indictment prior to the verdict, ... we apply a heightened scrutiny to ensure that every essential element of an offense has been charged." *Id.*

6

As to issue II, this court reviews "*de novo* the district court's denial of a motion for judgment of acquittal." *U.S. v. Jaensch*, 665 F.3d 83, 93 (4th Cir. 2011). As for the sufficiency of evidence, this Court reviews "the sufficiency of the evidence to support a conviction by determining whether there is substantial evidence in the record, when viewed in the light most favorable to the government, to support the conviction." *United States v. Madrigal–Valadez*, 561 F.3d 370, 374 (4th Cir.2009) (internal quotation marks and citation omitted).

As to issues III and IV, generally, "[t]he decision to give or not to give a jury instruction is reviewed for an abuse of discretion." *United States v. Moye*, 454 F.3d 390, 398 (4th Cir. 2006), however it must be noted that this Court "review[s] a jury instruction to determine whether, taken as a whole, the instruction fairly states the controlling law. By definition, a court abuses its discretion when it makes an error of law." *Id.* (cleaned up).

As to issue V, "Fed. R. Crim. P. 12(b)(3)(B)3 permits a court to dismiss a defective indictment. An indictment is defective if it alleges a violation of an unconstitutional statute." *United States v. Brown*, 715 F. Supp. 2d 688, 689 (E.D. Va. 2010).

7

## SUMMARY OF THE ARGUMENTS

It would be absurd for an indictment under the Controlled Substances Act to simply allege a defendant possessed a "Schedule I" substance, without more. Rather, it must identify precisely the substance alleged, because "the chemical and legal definition of these substances is itself technical and requires precision." *U.S. v. Huff*, 512 F.2d 66, 68–69 (5th Cir. 1975). Appellant here, though, was charged in the superseding indictment with the knowing "recei[pt] and possess[ion of] a firearm, namely a PPSH machinegun, which was not registered" to him in "violation of 26 U.S.C. §§ 5841, 5845, 5861 (d) and 5871." (JA37). A quick glance at §5845 shows no less than seven independent definitions of "machinegun," each with divergent essential elements. Each of the charges in the indictment were this conclusory, depriving Appellant of the notice required by the Sixth Amendment.

Beyond the indictment, pivotal in this case is "the classification of [the affected articles] as unlawfully [transferred and possessed firearms] …a legal question of statutory interpretation." *United States v. Dodson*, 519 F. App'x 344, 347–48 (6th Cir. 2013). There are no questions of degree when it comes to the National Firearms Act, "something is or is not" a

machinegun or destructive device. *United States v. Crooker*, 608 F.3d 94, 97–98 (1st Cir. 2010). The district court erred in failing to resolve—and then submitting to the jury—this legal question. Even so, no reasonable jury, properly instructed, could have returned a conviction as to Mr. Adamiak.

The theory that something *is* what it *resembles* in the firearms context was recently held to be "without any objective hook in the statute" by the Fifth Circuit. *VanDerStok v. Garland*, 86 F.4th 179 at 190 n.13 (5th Cir. 2023). Rather than pointing to any particularly dangerous characteristics of the subject articles, or any evidence of what the articles *actually were*, the government rests its entire theory on its own unpublished, unpromulgated opinions as to where lines are to be drawn. That is exclusively the role of Congress. If the statute actually proscribes destroyed, incomplete, and non-functional items, then it is incredibly vague on that point and must be narrowly construed to avoid an absurd result and constitutional shortfalls.

If, on the other hand, the destroyed relics somehow fall under § 5845, then it is an accoutrement qualifying as an arm under the Second Amendment, and thus it was the government's burden to show that criminalizing things like these parts is deeply rooted in American legal text, history, and tradition. The government refused to do so, and the district court allowed it to shirk this burden.

9

# ARGUMENT

## I.    THE DISTRICT COURT ERRED IN DENYING THE MOTION TO DISMISS THE INDICTMENT

Where the elements of a crime must be ascertained by reference to other statutes—as is the case with every charged count here—it is not sufficient to set forth the offense in the words of the statute alone. The Sixth Amendment requires that the facts necessary to bring the case within the definitions must also be alleged. *United States v. Carll*, 105 U.S. 611 (1881) ("it is not sufficient to set forth the offence in the words of the statute, unless those words of themselves fully, directly, and expressly, **without any uncertainty or ambiguity**, set forth **all** the elements necessary to constitute the offence intended to be punished; and the fact that the statute in question, read in the light of the common law, and of other statutes on the like matter, enables the court to infer the intent of the legislature, **does not dispense with the necessity of alleging in the indictment all the facts necessary to bring the case within that intent**" (emphasis added)); s*ee also*, *United States v. Smith*, 43 F.3d 1469 (4th Cir. 1994).

10

### a. Counts 1 and 2: The Indictment Did Not Identify the Elements of the Charged Offense

Count 1 of the superseding indictment charged appellant with the "knowing" receipt, possession, and transfer of "a firearm, namely a PPSH machinegun, which was not registered [to him] as required by 26 U.S.C. §5841." (JA37). Count 2 charged appellant with "knowingly possess[ing] and transferring a machinegun, that is a PPSH machinegun" in violation of 18 U.S.C. §922(o). (JA38). Appellant timely moved to dismiss the indictment, complaining that "Counts 1 and 2 of the indictment are entirely barren as to what makes the alleged PPSH a machinegun." (JA51_. Additionally, Count 2 fails to even track the language of the statute. (JA38); 18 U.S.C. § 922(o). *cf. United States v. Wonschik*, 353 F.3d 1192, 1196 (10th Cir. 2004) (indictment charging that Defendant "did unlawfully and knowingly possess a machinegun, to wit: a combination of parts, in the possession and control of [Defendant], namely: a Colt, Model SP1, .223 caliber, semi-automatic rifle, an M16 selector, an M16 bolt carrier, [and several more parts], from which a machine gun could be assembled").

The district court denied the motion, suggesting that "whether a particular firearm or device qualifies as a machinegun or destructive

11

device is a question of fact to be developed at trial." (JA94). An item's status as a machinegun under the law is a distinctly legal question. "The definition of the elements of a criminal offense is entrusted to the legislature, particularly in the case of federal crimes," such an interpretation requires an "inference of the intent of Congress." *Staples*, 511 U.S. at 604-05, 114 S.Ct. 1793 (alteration in original).

The district court's error with respect to the indictment is illuminated by its order denying Appellant's motion for judgment of acquittal, where it misidentified the elements for Count 1 as "No. 1, would be the defendant received and/or possessed a machine gun… Second element would be that he knew he was possessing those items. And 3, the firearms were not registered." (JA 771-772). "Then as it pertains to Count 2," the district court opined that "elements would be that, No. 1, he possessed and/or transferred the firearm; two, that it was a machinegun, and three, that he acted knowingly." (JA 772). The honorable court below did not properly identify the elements of the offense, and this misunderstanding likely fueled its failure to observe this flaw in the indictment.

The National Firearms Act's machinegun definition is disjunctive and covers a host of different items.

> The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

26 U.S.C. § 5845(b). A machine gun, then, is defined to include seven distinct, technical, and highly distinguishable definitions of the term, each sub-definition containing unique elements.[2] The Act was amended to ultimately cover (1) a weapon which actually shoots automatically; (2) a weapon designed to shoot automatically, despite that it might not presently; (3) a weapon which once shot automatically but has had that capability removed in a way that can be readily restored; (4) the frame or receiver of a weapon which shoots, shot, or is designed to shoot automatically; (5) any single part designed and intended, solely and exclusively, in converting a weapon into weapons 1, 2, or 3; (6) a

---

[2] Even the ATF has recognized the complexity of §5845(b)'s sub definitions. ATF Rul. 83-5; ATF Bul. 1983-3 at 35.

13

combination of parts designed and intended for converting a weapon into weapons 1, 2, or 3; and (7) any combination of parts from which such a weapon can be assembled if such parts are in the possession or under the control of a person.

Given these seven distinct definitions, possession of an unregistered "machinegun" may involve seven distinct crimes, each with different elements. This Court has recognized that charges relating to §5845(b) must be brought specifically. *U.S. v. Nieves*, 108 Fed. Appx. 790, 793 (4th Cir. 2004). In *Nieves*, the indictment charged defendant with an operable machinegun, *i.e.*, sub-definition (1). The trial court there, as here, instructed the jury with the entire text of §5845(b), *i.e.*, all seven definitions. This allowed the prosecution to switch, at its will, from an operable "weapon" case to a "combination of parts" case. As this honorable court observed:

> A defendant may only be tried on charges alleged in an indictment, and only the grand jury may broaden or alter the charges in the indictment. An indictment is constructively amended "when the essential elements of the offense are altered to broaden the possible bases for conviction beyond what is contained in the indictment. A constructive amendment to an indictment occurs when either the government, the court, or both, broadens the possible bases for conviction beyond those presented by the grand jury.

*United States v. Bolden*, 325 F.35 471, 493 (4th Cir. 2003) (cleaned up).
Guided by constitutional principles, the *Nieves* court concluded that the
indictment was constructively amended by the jury charge, in
combination with the introduction of gun parts evidence. *Nieves*, 105
Fed.Appx at 793. I*ee also U.S. v. Doucet*, 994 F.2d 169, 170 (5th Cir. 1993)
(possession of an unregistered machinegun as a combination of parts,
versus other definitions, is a "crime" "different materially" from
possession of an unregistered machinegun defined as an operable
weapon, and that being the case, the indictment must specify which
definition is applicable); *cf. United States v. Carter*, 465 F.3d 658, 664
(6th Cir. 2006) (holding an indictment explicitly alleging "the receiver of
a Sten MkII machinegun, and a combination of parts designed and
intended, for use in converting a weapon into a machinegun"—i.e.,
definitions (4) *and* (6)—to satisfy Fed. R. Crim. P 7(c)(1) because it cited
the law violated and set out "clearly and concisely" what the defendant
was charged with).

In contrast to *Nieves* and *Doucet*, where the indictments became
defective after the court and government failed by instructing the jury as
to the elements of crimes never charged in the indictment, here,

15

Appellant Adamiak was *never* afforded Constitutionally sufficient notice, and the government was permitted to rely on and present evidence regarding divergent theories of criminality. (JA579) ("Is that a complete machine gun that you have in front of you?") (JA587) (soliciting divergent legal definitions of "firearm") (Doc. 118 at 80) ("No, are you going to be able to shoot a receiver? No. But all you've got to do is add the other parts to it and then you've got a fully functional machine gun.").

Just as "[m]en of common intelligence cannot be required to guess at the meaning" of a criminal enactment, an indictment cannot do the same with respect to the elements a Defendant must guard against. *Winters v. New York*, 333 U.S. 507, 515 (1948). As the Supreme Court warned, ill-defined charges that leave "the prosecution free to roam at large—to shift its theory of criminality so as to take advantage of each passing vicissitude of the trial and appeal" pose issues of Constitutional significance. *Russell v. United States*, 369 U.S. 749, 768 (1962). As such, the district court committed reversible error in refusing to dismiss the indictment, and in its constructive amendments to the indictment.

## b. The Same Analysis Applies to Counts 3, 4, and 5.

Count Three of the indictment stated Adamiak "did knowingly receive and possess a destructive device, namely a [sic] M79, 40mm grenade launcher, which was not registered to the defendant…as required by 26 U.S.C. § 5841." Count Four charged that Adamiak "did knowingly receive and possess a destructive device, namely a [sic] M203, 40mm grenade launcher, which was not registered to the defendant…as required by 26 U.S.C. § 5841." Count Five charged that Adamiak "did knowingly and unlawfully receive and possess two destructive devices, namely two RPG-7 variant recoilless antitank projectors, which were not registered…as required by 26 U.S.C. § 5841." Appellant, in his motion to dismiss the indictment, pointed out that the indictment was "facially defective" because it did not identify the elements of a destructive device or a weapon allegation, pointing out that "case law has made clear in this otherwise ambiguous definition [] that the law requires something [] more than the barebones" allegation the government made in the superseding indictment. (JA52).

Like with Counts One and Two, the district court's misunderstanding here is better understood in light of its order denying

17

the motion for judgment of acquittal, where it identified the elements for Counts 3, 4 and 5 as that "the defendant received and/or possessed...destructive devices...that he knew he was possessing those items...and [] the firearms were not registered." (JA771-772). The district court did not cite any additional authority, or any authorities involving the elements of a "destructive device", like discussed in Part I(a).

As discussed *supra*, the indictment must "fully, directly, and *expressly*, without any uncertainty or ambiguity, set forth *all* the elements necessary to constitute the offence intended to be punished." *U.S. v. Carll*, 105 U.S. 611, 612 (1881) (emphasis added). Just as "machinegun" has varied definitions, "destructive device" in the National Firearms Act has even more varied definitions, which are even more complicated.

26 U.S.C. § 5845 (f) defines "destructive device" as follows:

The term "destructive device" means (1) any explosive, incendiary, or poison gas (A) bomb, (B) grenade, (C) rocket having a propellent charge of more than four ounces, (D) missile having an explosive or incendiary charge of more than one-quarter ounce, (E) mine, or (F) similar device; (2) any type of weapon by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, the barrel or barrels of which have a bore of more than one-half inch in diameter,

18

except a shotgun or shotgun shell which the Secretary finds is generally recognized as particularly suitable for sporting purposes; and (3) any combination of parts either designed or intended for use in converting any device into a destructive device as defined in subparagraphs (1) and (2) and from which a destructive device may be readily assembled. The term "destructive device" shall not include any device which is neither designed nor redesigned for use as a weapon; any device, although originally designed for use as a weapon, which is redesigned for use as a signaling, pyrotechnic, line throwing, safety, or similar device; surplus ordnance sold, loaned, or given by the Secretary of the Army pursuant to the provisions of section 7684(2), 7685, or 7686 of title 10, United States Code; or any other device which the Secretary finds is not likely to be used as a weapon, or is an antique or is a rifle which the owner intends to use solely for sporting purposes.

Appellant would quickly exceed his word limitations if he attempted to delineate the myriad different elements of the myriad sub-definitions of "destructive device" under §5845(f). The bare assertion that an item is a "destructive device," without more, certainly does not provide for all the elements necessary for a Defendant to mount a meaningful defense. In addition, the terms "grenade launcher" and "recoilless antitank projector," the only specificity in the indictment, are not in the statute. This amplifies the constitutional deficiencies in counts 1 and 2, with the same "parts versus complete" issue central to *Nieves*. Here, as well, the jury was instructed as to the entirety of § 5845(f) and the government freely transitioned between theories of criminality.

19

For the reasons heretofore stated, the indictment fails with respect to all charged counts.

## II.  THE DISTRICT COURT ERRED IN DENYING THE MOTIONS FOR JUDGMENT OF ACQUITTAL

### a. The District Court Submitted a Critical Question of Law to the Jury

The district court erroneously allowed the jury to decide a purely legal question, *viz.*, whether a pile of WWII-era parts—one of which was conspicuously sawed in half—, a conspicuously inert tube, and a litany of parts found throughout the home of a collector were or could be a "firearm" within the meaning of 26 U.S.C. § 5845 .

Questions of law are for the court, not the jury. This issue was raised in the motion to dismiss the indictment, (JA46-49), which was denied, (JA91), and in the motion for judgment of acquittal (JA762), which was denied. (JA774). When questions regarding statutory text arise, it is the role of the courts to approach these interpretive problems methodically, using traditional tools of statutory interpretation, to confirm any assumptions about the "common understanding" of words. *Facebook, Inc. v. Duguid*, 592 U.S. 395, 402 (2021).

20

While the distinction between questions of fact and law is sometimes "vexing," that is not the case here. *Pullman-Standard v. Swint*, 465 U.S. 273 at 288 (1982). Where the classification of an item as a "firearm" has been raised in the various courts of appeal, there has been little disagreement that is manifests "a legal question of statutory interpretation subject to *de novo* review." *U.S. v. Dodson¸*519 Fed.Appx. 344, 347 (6th Cir. 2013); *see also Guedes v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 520 F. Supp. 3d 51, 58 (D.D.C. 2021), aff'd, 45 F.4th 306 (D.C. Cir. 2022) ("the central legal question" concerned application of the "machinegun" definition); *U.S. v. Hamrick*, 43 F.3d 877 (4th Cir. 1995) (en banc) (evenly divided in its legal analysis as to whether charged device constituted a destructive device).

In any event, courts have a duty to interpret statutory language according to its ordinary, contemporary, common meaning Thus, not only did the court improperly divest itself of its duty to interpret that statute at the Motions to Dismiss and for Judgment of Acquittal, but it entrusted the jury to interpret and apply a statute absent important context. In both respects, this is reversible error. *See Curley v. Klem*, 499 F.3d 199

at 211 (3d Cir. 2007) ("When a district court submits that question of law to a jury, it commits reversible error").

### b. Counts 1, 2, and 5: The Trial Court Erroneously Dispensed With its Duty of Statutory Interpretation Concerning Destroyed Firearms

An issue common to Counts 1, 2, and 5 is that the complained-of articles were conspicuously inert or disintegrated. In addressing this fact, the government's position was to simply assert that the items were "complete" and "functional," (JA579) and to rely on the testimony of ATF agents to assert that the items were "not destroyed at all," (JA511) according to standards the government admitted were absent from the statute and published nowhere. (JA610).

Rather than facing the fact that "something is or is not" a "firearm" under the Acts and engaging in statutory interpretation, the district court appears to have simply taken the government at its word. *United States v. Crooker*, 608 F.3d 94, 97–98 (1st Cir. 2010). This is below the level of proof and notice that Due Process requires.

In 2017, ATF rulings—which the government heavily relied in asserting the charged articles were not sufficiently destroyed—became

22

subject to the Attorney General's Prohibition on Improper Guidance Documents. The Attorney General, Prohibition on Improper Guidance Documents, November 16, 2017. https://www.justice.gov/opa/press-release/file/1012271/download. The Department of Justice was directed to adhere to certain principles, including that "Guidance documents should not use mandatory language such as "shall," "must," "required," or "requirement" to direct parties outside the federal government to take or refrain from taking action, except when restating-with citations to statutes, regulations, or binding judicial precedent-clear mandates contained in a statute or regulation. *Id.*

The Bureau set forth its position on the legal status of ATF rulings quite clearly when it explained why the Administrative Procedure Act ought not apply—quite relevantly—to a series of rulings concerning ways in which to demilitarize or destroy machinegun receivers:

> (1) ATF Rulings 2003-1, 2003-2, 2003-3, and 2003-4 do not change existing recommendations for "an ATF-approved method of destruction." … **Additionally, these rulings do not change ATF's position that a machinegun receiver may be destroyed by other methods**. Therefore, ATF was not bound by the APA's requirements when it issued these rulings because they do not "effect a change in existing law or policy." …

23

(2) Even if ATF Rulings 2003-1, 2003-2, 2003-3, and 2003-4 changed ATF's existing recommendations to insure proper destruction, **these rulings are merely recommendations for the proper destruction of certain receivers, they are not absolute requirements**. Since these rulings only recommend one ATF-approved method of destruction and plainly state that other methods may be acceptable, **it is clear that these rulings do not "grant rights, impose obligations, or produce other significant effects on private interest."** Therefore, ATF was not bound by the APA's notice and comment requirements …

(3) The rulings set forth ATF's classification under the GCA and NFA of four types of machinegun receivers destroyed in the manner specified in each ruling. … **Federal courts have uniformly held that ATF's firearms classifications are informal adjudication and not a rulemaking of any stripe**.

John P. Malone, Assistant Director, Firearms, Explosives and Arson, Bureau of Alcohol, Tobacco and Firearms, to Mark Barnes, CC-77347 FEA:HF May 14, 2003 (emphasis added).

The only published destruction directives the government relied on for the proposition that the articles were not sufficiently destroyed are these exact ones discussed in A.G. Malone's 2003 letter. (JA600-JA602); ATF Rul. 2003-1; ATF Rul. 2003-2; ATF Rul. 2003-3; ATF Rul. 2003-4. Notably, each of these "rulings" are directed and concerned **exclusively with the importation of the affected firearms**. They are addressed to those seeking to make machinegun parts "importable under 26 U.S.C. 5844 and 18 U.S.C. 922(o) for **unrestricted commercial sale.**" *Id*. No

24

reading of 26 U.S.C. § 5845 would point a reasonable person to unpublished, unpromulgated guidance directed at licensed importers under § 5844.

These "rulings," which have neither the force nor effect of law, pose another problem: the ATF had never openly opined as to what constituted proper "destruction" prior to 2003. As the rulings recognize, destruction of machinegun receivers render the parts suitable for "unrestricted commercial sale." ATF Rul. 2003-1 through 4. The same applies to the government's insistence below that a 40mm hole in area with enough pressure to remove "the head" of whoever attempted to fire it is enough to destroy it, but a 10mm hole in the same area of conspicuously face-removing pressure leaves the item somehow usable. (JA527) ("It would remove your head.") *cf.* (JA685). With regard to the inert RPG projectors, the government has published no destruction guidance.

The government's reliance on unpublished, unpromulgated opinions presents notice and Due Process issues. Furthermore, no evidence was put up to suggest *when* the items were imported. If the unpublished opinion letters were due any weight at all, it could only be with respect to conduct *after* the publication. This is in contrast to past

instances, when the ATF adopted formal rulings for the first time, it explicitly rendered its classifications nonretroactive, and then tested its theories in civil actions rather than criminal prosecutions. *See* ATF Rul. 81-4; *S.W. Daniel, Inc. By & Through Daniel v. United States*, 831 F.2d 253 (11th Cir. 1987). In those cases, it can be argued the government gave notice and an opportunity to be heard before rendering a new classification, unlike here where its unpublished, unpromulgated theory of "proper destruction" is being tested against the life and liberty of a young man, based on import guidance from 2003, as applied to items that may have been destroyed and imported into the United States at almost any point in the last century. If the government prevails on this theory, it stands for the proposition that ATF could, at any time, adjust what it considers to be "sufficiently destroyed," and anyone in possession of the parts it previously deemed suitable for "unrestricted commercial sale" be at risk of imprisonment. Congress cannot have intended such an absurd result.

The Supreme Court has unambiguously rejected agency interpretation of a criminal statute in the NFA context. In *U.S. v. Thompson/Center Arms Co.*, the trial court accepted the government's

26

reliance on an unpromulgated ATF ruling, but the Court of Appeals characterized the ruling as "a substantial and…unwarranted extension of the statute's plain meaning," 924 F.2d 1041, 1045 (Fed. Cir. 1991), aff'd sub nom. *United States v. Thompson/Ctr. Arms Co.*, 504 U.S. 505 (1992). The Supreme Court accorded the ruling no weight and held that any ambiguity in a criminal statute must be interpreted according to the rule of lenity—that is, against the government—and that an agency is due no deference in interpretation of a criminal statute. *U.S. v. Thompson/Center Arms Co*, 504 U.S. at 518.

The unpromulgated, unpublicized opinions of ATF agents is due no weight. Rather, the common understanding of terms controls. Appellant cannot think of many instances where cutting something in half, gutting its components, drilling holes in areas that need to retain pressure, and otherwise would still be considered "complete" and "serviceable." (JA650). Certainly an automobile, sawed in two, would be difficult to pass on to a consumer as a complete and serviceable vehicle. Appellant can see no reason why that should be inverted in the context of destroyed relics.

### c. Counts 1 and 2: No Reasonable Jury, Properly Instructed, Could Have Returned a Conviction As To the PPSH Parts

27

The PPSH at the core of Counts 1 and 2 consisted of a collection of unmounted, WWII-era parts and a conspicuously cut-in-half tubular section. The Act does *not* cover chunks that might be "readily restored" into a frame or receiver. The "readily restored" language is limited to something that is at present a *weapon*. Where the Act contains seven sub-definitions of "machinegun," all of which contain disparate wording, it is clear Congress did not intend those proverbial streams to be crossed with abandon. 26 U.S.C. 5845(b).

To avoid unnecessary spilling of ink, Appellant submits the sub-definitions it has identified as (1), (5), and (6) *supra*, Section I(a), plainly do not apply. It is uncontroverted that the PPSH parts do not "shoot" at all. Appellant will thus explain why it cannot have been found to have fit in the other sub-definitions.

> **i.** Sub-definitions (1), (2), and (3) are inapplicable because a box of inoperable PPSH parts is not a "weapon"

What Appellant identifies as machinegun sub-definitions (1) through (3) all begin with the qualifier "weapon." This is something not often litigated, as the heartland of machinegun cases generally concerns things that are unambiguously weapons, however, the several circuit

28

courts of appeal have shown some light in the context of destructive devices, which will also be illuminating *infra*.

Destructive devices are defined in the same act as machineguns. 26 U.S.C. §5845(f). There, items that otherwise may fall under §5845(f) do not constitute covered "firearms" if the charged item is "any device which is neither designed nor redesigned for use as a weapon". *Id.*

"Weapon" is not defined anywhere in the statute, and thus bears its ordinary meaning. A "weapon" is "something (such as a club, knife, or gun) used to injure, defeat, or destroy; or a means of contending against another. "Weapon." Merriam-Webster.com Dictionary, Merriam-Webster, https://www.merriam-webster.com/dictionary/weapon. The Supreme Court, in addressing the similar term observed "arms" to include "any thing that a man wears for his defence, or takes into his hands, or useth in wrath to cast at or strike another." *District of Columbia v. Heller*, 554 U.S. 570, 581 (2008).

Even if some of the PPSH parts were, at one point in time, a weapon, with its destroyed and unfit parts, it could hardly be used to "injure, defeat, or destroy" in the condition as-charged.

29

    **ii.** Sub-definition (3) is inapplicable because, in addition to not being a weapon, welding together a critical part is not something that can be done "readily."

Given the definition's inclusion of something which can be "readily restored" to a condition and the statute's bare use of "assembled" shortly thereafter, the statute's silence as to what constitutes "readily restored" as opposed to "assembled" warrants examination of the statutory history. As explained by the original proponents of this sub-definition: "'Readily restored to shoot' is intended to mean that only a simple mechanical operation is required to restore a weapon to a capacity of fully automatic fire. It is not intended to cover deactivated weapons that have had chambers closed and barrels securely welded." Sheldon Cohn, then-Commissioner of the Internal Revenue, explained how, at that point, some deactivated machineguns sold to the public by the government and otherwise "were deactivated in such a way that simple insertion of a paper clip and removing a certain piece would make them usable again." Proposed Amendments to Firearms Acts: Hearings Before the Committee on Ways & Means, House of Representatives, 89th Cong., 1st Sess., 7, 47 (1965). This context is important, as the section is clearly targeted at items stemming from the Deactivated War Trophy and demilitarization

30

program—targeted at returning servicemembers who may have creatively returned from foreign conflicts with foreign firearms—which permitted owners of then-unregistered NFA firearms to keep them, if they rendered the firearm inoperable by welding the barrel shut. *See* Rev. Rul 55-90, 1955-2 C.B. 483 (1955); Rev. Proc 58-8, 1958-1 C.B. 690 (1958). The 1968 amendments introducing the "readily restored" language coincided with the discontinuation of the DEWAT program, requiring registration of previously unregistered DEWAT items, whose deactivation procedure was, oftentimes, easily defeated, such as with a paperclip.

In every case to substantially engage with sub-definition (3), the frame or receiver of the alleged machinegun was present and intact. *U.S. v. McCauley*, 601 F.2d 336, 338 (8th Cir. 1979) (Japanese firearm missing the magazine which was required to fire automatically was readily restorable); *U.S. v. Shilling*, 826 F.2d 1365, 1367 (4th Cir. 1987) (semiautomatic rifles possessed with machinegun parts adequate for full automatic fire were readily restorable); U.S. v. Alverson, 666 F.2d 341, 344 (9th Cir. 1982) (Dismantled Thompson machinegun with one part swapped with another was readily restorable).

31

The most substantial analytic approach to the phrase is set forth in

*U.S. v. Aguilar-Espinosa*,

> The phrase "readily restored" lacks reassuring precision, but I assume "ready restoration" means a less than arduous assembly of manageable and available parts by a combination of (1) the ability of a reasonably skilled and informed but not necessarily expert or artistic worker and (2) tools commonly understood by and commonly available to such workers, including, for example, Allen wrenches, files, jeweler's screw drivers, and the like but excluding, for example, the resources available to a master machinist with a modern and well-equipped lathe.

57 F. Supp. 2d 1359, 1362 (M.D. Fla. 1999). The *Aguilar-Espinosa* court aptly identifies that the test is about the readiness of the restoration, rather than the feasibility. As for the question of readily restored *by whom*, courts have yet to come down solidly, but it seems more likely that Congress intended an ordinary, reasonable person standard as opposed to skills and tools beyond those of the average person. Appellant respectfully submits that—while most men may wish they knew how to competently weld and shape steel—it is not likely the average person actually does.

The D.C. Circuit has observed that an item which was at one point a machinegun receiver lost that character when features that made it a machinegun were eliminated, over the government's assertion to the

contrary, and ultimately held that the rule of lenity must resolve all doubts in favor of the Defendant. *F.J. Vollmer Co., Inc. v. Higgins*, 23 F.3d 448, 452 (D.C. Cir. 1994).

In a criminal prosecution, the readiness of the restoration must have been proven beyond a reasonable doubt. Below, the government relied primarily on the testimony of a CI whose testimony as to how long it would take him to build firearms shrank over the course of the trial the way one expects the catch in a fishing story to grow. (JA509); (JA512); (JA563). The government's attempt to extend the scope of sub-definition (3) to include parts with destroyed components, rather than those with complete receivers, would overrule most of the above-cited cases.

> **iii.** Sub-definition (4) (and indeed the entire section) was not applicable because the PPSH parts did not contain a "frame or receiver." Furthermore, such was not charged in the indictment.

Whatever the destroyed chunks of metal present in the PPSH parts are or were, for a conviction to be sustainable *at all*, a frame or receiver must have existed. Such was not pled or proven here.

Adamiak was indicted in June of 2022. At that point, the federal register defined a "frame or receiver" as "[t]hat part of a firearm which

provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." 27 CFR 478.11; 479.11. In baldly referring to the cut-up parts as "complete" and "serviceable," the government was again relying on unpublished, unpromulgated rulemaking. Indeed, the theory of what constitutes a "frame or receiver" asserted by the government below, as well as its theory of what "readily" means, are rooted in a rulemaking that would not hit the federal register until August of 2022. 87 FR 24652.

The government's attempt to enshrine this theory through the APA was recently struck down by the Fifth Circuit in the context of unfinished firearm frames and receivers. *VanDerStok v. Garland*, 86 F.4th 179 (5th Cir. 2023) (cert granted 2024). This is the exact same theory the government proceeded under below: that something *is* what it *resembles*. A theory the Fifth Circuit saw to be "without any objective hook in the statute." *Id.* at 190 n.13. It cannot be the case that a theory of enforcement be so disconnected from the statute that its implementation violates the APA, but simultaneously carry the day in a criminal prosecution.

**iv.** Sub-definition (7) can not apply because, in addition to not being charged, welding and fabrication is not "assembly."

The government's evidence focused on its position that parts of the PPSH were not destroyed enough, and the alleged ease with which the government represented a functional firearm might possibly be assembled. However, this sub-definition refers only to "assembly," rather than fabrication. This is contrary to the definition of "silencer", in the same Act, which recognizes as distinct concepts parts intended for use in "assembling **or fabricating**" a silencer. 26 U.S.C. § 5845(a)(7), incorporating 18 U.S.C. § 921(a)(24).

Congress has clearly distinguished the terms "assembly" and "fabrication." Parts must first be fabricated before they may be assembled. This distinction is recognized in the definition of "make" as including "putting together," which corresponds to assembly, and "manufacturing, altering, ... or otherwise producing a firearm," which corresponds to fabrication. 26 U.S.C. § 5845(i). If the term "assembly" is stretched to include alteration and fabrication such as by filing, sawing, or welding, then every semiautomatic is an unassembled machinegun,

35

and every rifle or shotgun is an unassembled sawed-off firearm. Congress

could not have intended such an absurd result.

### d. The District Court Cannot Simultaneously Convict Under §5861(d) and §922(o)

The Double Jeopardy Clause of the Fifth Amendment protects

against multiple punishments, and "cumulative sentences are not

permitted for two statutes that proscribe the same offense, unless

elsewhere specially authorized by Congress." *Missouri v. Hunter*, 459

U.S. 359, 367 (1983) (cleaned up). The *Blockburger* test determines

whether to statutes define the same offense in asking "whether each

provision requires proof of a fact which the other does not." *Blockburger

v. United States*, 284 U.S. 299, 304 (1932).

 Though the indictment mis-stated 922(o), (JA38) ("knowingly

possess and transfer" versus 922(o)'s "possess or transfer"), "§922(o) does

not require proof of any element that is not also required under §5861(d).

The former statute requires possession of an item that qualifies as a

machinegun with knowledge of the essential characteristics that make

that item a machinegun…and the latter statute requires all of those same

elements (plus an additional element concerning the lack of registration).

36

The §922(o) charge is therefore a lesser-included offense of the §5861(d) charge." *United States v. Kuzma*, 967 F.3d 959 (9th Cir. 2020) *accord U.S. v. Mann*, 701 F.3d 274 (8th Cir. 2012). This caused constitutionally significant issues at sentencing, where the district court imposed sentences for Counts One and Two consecutively. (JA2227).

### e. Counts 3, 4, and 5: No Reasonable Jury, Properly Instructed, Could Have Returned a Conviction As To the Alleged Destructive Devices

The National Firearms Act's definitions of "destructive device" are laid out *supra*, Part I(b). Where the Act contains three sub-definitions of "destructive device," at least six sub-definitions to the sub-definitions, and at least three exclusions with sub-exclusions, all of which contain disparate wording, it is clear Congress did not intend those proverbial streams be crossed with abandon. 26 U.S.C. 5845(f).

The analysis here is made difficult given the indictment issues discussed *supra*, Part I, as the District Court's denial of the pre-verdict Rule 29 motion provided no insight as to what type of "destructive device" the court below believed to be sufficiently presented. (JA772).

37

With respect to the destructive device counts, though, the law clearly requires proof beyond a reasonable doubt that the item was "designed []or resdesigned for use as a weapon", rather than "a signaling, pyrotechnic, line throwing, safety, or similar device;" among other things. 26 U.S.C. § 5845(f). Indeed, as this honorable Court has observed, "inert" articles, by definition, are not "destructive devices" nor can they be "readily assembled" into "destructive devices." *United States v. Blackburn*, 940 F.2d 107, 110 (4th Cir. 1991). *Blackburn* concerned a defendant who purchased what he thought were 30 live grenades, but because only two of the grenades had powder, he could only be sentenced for possession of two destructive devices, noting that "the definition of 'destructive device' remains the same both for cases involving § 5861 indictments or convictions and for sentences involving U.S.S.G. § 2K2.2(b)". *Id* at 109.

Whether components intended to construct a pipe bomb were a destructive device was a key issue in an appeal of the courts martial to the Army Court of Criminal Appeals. In that case, the Defendant clearly intended to make a pipe bomb, but saw his conviction reversed because he did not have a drill or fuse to complete the device. *United States v.*

38

*Enright*, ARMY 20030379, 2005 CCA Lexis 627, *4 (U.S. Army Ct. Crim. App. Apr 20, 2005). Here, as in similar cases where reversal was proper, there was no evidence presented that Appellant had the necessary skills, equipment, or material necessary to "readily assemble" the components he possessed into a destructive device.

As discussed earlier in the context of Counts 1 and 2, Part II(b), the government relied almost exclusively on unpublished internal ATF guidance documents for the position that the subject articles were "destructive devices."[3]

> **i.** The Government Provided No Evidence the Subject Articles Were "Weapons"

Common to all of the destructive device counts, the government put forth no evidence as to what made these articles were "weapons" in their present state. Unlike in the case of machineguns under §5845(b), where

---

[3] In the cross examination of case agent Hairston, the ATF agent recited, virtually unprompted that "I guess, of this weapon, you can have a barrel without a receiver and that's okay. You can have a receiver without the barrel, and that's okay. But once you come in possession of both, that's when it becomes a destructive device, and in this case a 40mm grenade launcher." (JA457)

39

"weapon" is used in some, but not all sub-definitions, the entirety of

§5845(f) specifies that

> "'destructive device' shall not include any device which is neither designed nor redesigned for use as a weapon; any device, although originally designed for use as a weapon, which is redesigned for use as a signaling, pyrotechnic, line throwing, safety, or similar device … or is a rifle which the owner intends to use solely for sporting purposes."

Thus, under any sub-definition, any item which is neither "designed nor

redesigned for use as a weapon," or something "originally designed for

use as a weapon" but is now redesigned for other uses.

One witness for the government asserted that the M79 and M203

"ha[ving] a bore over half of an inch and [being] a weapon" is what made

them a destructive device, and "that it's a 40mm rifled bore…that's what

makes a weapon as opposed to a 37mm or 38mm signaling device."

(JA670). This is absent from the statute and nowhere in the jury

instructions. Still, the same witness agreed that an M79 or M203 receiver

with an attached 38mm barrel would not be a "weapon" if "they did not

contain rifling or the presence of antipersonnel ammunition." (JA670).

This, at least, somewhat tracks with respect to antipersonnel

ammunition, as an item found loaded with antipersonnel ammunition

40

can fairly be considered a weapon, however, it does not flow that a device functions exclusively as a weapon just by reference to bore diameter where *no ammunition whatsoever* was found. (JA2480, 2481).

> **ii.** Counts 3 and 4: No Reasonable Jury, Properly Instructed, Could Have Returned a Conviction to the M79 or M203 being Weapons Which Can be "Readily Assembled"

As explained in Part I(b), the indictment's shortcomings, and the district court's instructions, force Appellant to guess as to what theory the grand jury indicted on, and what theory the petit jury convicted on. With Counts 3 and 4, the government reluctantly put on evidence that Mr. Adamiak had a replica M203 receiver and a replica M79 receiver as well as other barrels to include 37mm barrels, from which multiple lawful configurations could be assembled. (JA790). Save from legal conclusions, the government put up no evidence as to the design or intent of the components they found, no evidence of Appellant's knowledge with respect to the particular items they found, and forcefully referred to the devices charged in Counts 3 and 4—which witnesses for the government repeatedly testified were disassembled (JA404)—exclusively as "grenade launchers" in closing following the reading of the entirety of § 5845(f) in jury instructions. (Doc. 118 at 36) ("grenade launcher, and there are two.

41

I don't think there's much dispute that he possessed it. On this, it was found at his house during the search warrant.").

In the context of disassembled or knockdown items, it has been long understood that a "firearm," for NFA purposes, is only made where "the aggregated parts…can be used for nothing except assembling a[n NFA] firearm", *U.S. v. Thompson/Center Arms Co.* 112 S.Ct. 2102, 2106 (1992), or where an otherwise unregulated item is kept in such close proximity and in such a condition with parts that would render it a regulated firearm that the likelihood of lawful use "is belied by the utter uselessness of placing the converting parts with the others except for just such a conversion." United States v. Kokin, 365 F.2d 595, 596 (3rd Cir. 1966) (carbine together with all parts necessary to convert it into a machinegun is a machinegun), cert denied 385 U.S. 987 (1966); *United States v. Zeidman*, 444 F.2d 1051, 1053 (7th Cir 1971) (pistol and attachable shoulder stock found in the same dresser constitute a short-barreled rifle).

Evidence at trial suggested that the following items found in Appellant's home:

- M203 receiver found inside locked office gun safe (JA463)

- M79 receiver found inside locked office gun safe (JA465)

- Inert replica M203 and M79 receiver, no testimony as to where found (JA459-60); (JA790);

- "other barrels" (JA790);

- M79 barrel found in drawer in living room (JA455);

- M203 barrel found in Pelican box (JA461).

Here, like in Thompson/Center, "we are not dealing with an aggregation of parts that can serve no useful purpose except the assembly of a firearm, or with an aggregation having no ostensible utility except to convert a gun into such a weapon." *Thompson/Center*, 504 U.S. 2107. Rather, we are dealing with a collector and re-seller who had "thousands of parts" all across his property. (JA499). A conviction is unsupportable as to Counts 3 and 4 due to a lack of evidence that the items were "weapons," and 2) even if parts to assemble a "weapon" existed, *Thompson/Center* and the rule of lenity preclude the statute's application here.

      **iii.** Count 5: No Reasonable Jury, Properly Instructed, Could Have Returned a Conviction to the Alleged RPG7s.

It is uncontroverted that the items described in the indictment as "two destructive devices, namely two RPG-7 variant recoilless antitank projectors", were rendered inert, had a 0.39" (10mm) hole in the high-pressure area, was missing critical fire control components, and were conspicuously engraved "INERT" and "TRAINING AID DUMMY." (JA467 line 21); (JA2490); (JA2492); (JA2494); (JA2490).

The government's purported "testing" of the alleged "rocket launcher" was with a 7.62mm training device and a multitude of parts the government installed, including an entire fire control mechanism. (JA2488-2504). The training device would not produce nearly the pressure of a rocket, but rather had all of the essential features of an ordinary gun in the device itself. (JA850). As mentioned *supra*, the item must be a weapon *in its present state*. It was recognized that a hole in the high-pressure area of an RPG7 would, if used as an antitank launcher "remove [the user's] head." (JA527).

As has been mentioned, something is or is not a destructive device. "[W]hat Congress meant by the term [destructive device] was an

association of the components of a destructive device, at the **same time and place**, capable of being converted into a destructive device." *U.S. v. Blackburn*, 940 F.2d 107 (4th Cir. 1991) (quoting *United States v. Davis*, 313 F.Supp 710, 713 (D.Conn. 1970)) *see also United States v. Posnjak*, 457 F.2d 1110, 1116 (2nd Cir. 1972) ("All of the necessary components … must be possessed in order to possess a destructive device.").

In *Blackburn*, this honorable court rightly observed that inert grenades which were simply missing powder could not be considered "destructive devices." *Blackburn*, 940 F.2d 107.

It is uncontroverted here that Appellant's alleged RPG7s were missing critical components and each contained a hole that would remove the user's face if it was used as a rocket projector. On this much, no reasonable jury, properly instructed, could have returned a conviction as to Count 5.

## III. *STAPLES* AND *MENS REA*: THE GOVERNMENT FAILED TO PROVE THE REQUISITE *MENS REA*

Like many of the issues on appeal, this one stems from the defects in the indictment discussed above, Part I. *Staples* held that "to convict him under the Act, the Government should have been required to prove

45

beyond a reasonable doubt that he knew the weapon he possessed had the characteristics that brought it within the statutory definition[.]"

The indictment never identified a single element of any charged article under the Act, and the government introduced no evidence of any specific knowledge as to Appellant, a failure Appellant addressed orally in his Rule 29 motion. (JA763) ("this case is not about what's required by ATF [for ATF itself to] consider something destroyed. The issue in this case is what did they prove to show this jury that my client knew these devices were destructive devices or machine guns in the state which he had them.") (JA769). Rather than proving Appellant's knowledge as to "the characteristics that brought" the affected articles "within the statutory definition," the district court instead approvingly observed that the government had put on evidence that the Defendant had been "put on notice by the CI and warned about the necessity of having these things registered."[4] (JA773). Continuing in its discussion of knowledge, the district court cited as support for scienter that "There's a document

---

[4] The court below and government put great weight on the testimony that the nonlawyer CI had claimed to offer unsolicited legal advice to Appellant about a device that wasn't even charged. (JA773)

46

regarding the burner that's in the record….We know that this is a profitable business. The dark web's involved.[5]…And the bottom line via the military he's very, very; smart, he's a leader, he's astute in the firearms world, and he's knowledgeable of rules and regulations." (*Id* at 773-74).

This is not about whether or not Appellant was smart, or knew about firearms. The *mens rea* requirement, as noted by the Supreme Court in *United States v. Freed*, depends on "the theory that someone who knowingly possessed 'highly dangerous offensive weapons' like hand grenade should not be surprised to learn that they are subject to government regulation." *U.S. v. Kindred*, 931 F.2d 609, 612 (9th Cir. 1991) (quoting *United States v. Freed*, 401 U.S. 601, 607-10 (1971)). The same does not logically flow where the charged articles are inert. *Staples* clarified that the government must "prove beyond a reasonable doubt that he knew the weapon he possessed had the characteristics that brought it within the statutory definition," as "dispensing with proof of knowledge of the characteristics that make a weapon a 'firearm' under

---

[5] No testimony that Appellant participated in the dark web can be gleamed from the record.

the statute…potentially would impose criminal sanctions on a class of persons whose mental state—ignorance of the characteristics of the weapons in their possession—makes their actions entirely innocent. Had Congress intended to make outlaws of such citizens, it would have spoken more clearly to that effect." *Staples v. U.S.*, 511 U.S. 600, 601 (1994).

The district court erred in denying the motion for judgment of acquittal. The government could not possibly have put up evidence sufficient to satisfy *Staples*, as the government never charged how the affected articles fell within the Act, instead relying on self-serving legal conclusions.

## IV. THE TRIAL COURT REVERSIBLY ERRED IN IMPROPERLY INSTRUCTING THE JURY

Generally, "[t]he decision to give or not to give a jury instruction is reviewed for an abuse of discretion." *United States v. Moye*, 454 F.3d 390, 398 (4th Cir. 2006), however it must be noted that this Court "review[s] a jury instruction to determine whether, taken as a whole, the instruction fairly states the controlling law. By definition, a court abuses its discretion when it makes an error of law." *Id.* (cleaned up).

48

The law here at issue has been thoroughly briefed *supra*, and the main concern appellant has with the jury instruction is with the failure to state the elements of an offense under each Count, especially the *mens rea* element.

The district court instructed the Jury, with respect to Counts 1, 3, 4, and 5, that:

> the government must prove the following three essential elements beyond a reasonable doubt:
>
> No. 1. That on or about the date alleged in the superseding indictment for Count 1, the defendant knowingly received or possessed a machinegun, and for counts 3, 4, and 5 the defendant knowingly received or possessed a destructive device;
>
> No. 2, that the defendant had knowledge that what he was possessing was a firearm;
>
> No. 3, that the firearm was not registered to the defendant in the National Firearms Registration and Transfer Record.
>
> It does not matter whether the defendant, Patrick Tate Adamiak, knew that the firearm was not registered or had not—or had to be registered.

(JA815-816).

The above instruction fails meet the knowledge requirement under *Staples*, and makes no mention of the defendant's knowledge of the characteristics of the firearm. Rather, by simply requiring "the defendant

49

had knowledge that he was possessing…a firearm", the instruction is devoid of the essential knowledge that Appellant "knew that his [items] had the characteristics that brought" them within the statutory definitions. *Staples*, 511 U.S., 600.

This defect is not cured by later instructions, as the court defines "firearm" as including "many different definitions of what a firearm is. In pertinent part, Section 5845(a) provides that the term "firearm" also means (6) a machine gun and (8) a destructive device." (JA816). The Court goes on to further pollute the jury by instructing that "You do not have to find that the firearm was loaded or that it was operable at the time of the offense"—then by instructing the jury as to the entirety of §5845(b) and (f)—which includes sub-definitions that *absolutely require the items be operable*—diluted the instructions so as to effectively eliminate a *mens rea* requirement. (JA815-818). This was not cured by instruction 29, which simply added "In addition, the government must prove that the defendant knew that the device he received or possessed had characteristics that make it subject to regulation as a firearm, as I just defined that term for you", (JA820), because it lacks any specific relation to the offense conduct. Rather, the instructions left the jury to

50

convict as to any one of "many different definitions of what a firearm is." (JA816). Then, for Count 2, the district court provided an entirely different pattern of instruction, stating the essential elements to be

> "No.1 , that the defendant possessed or transferred a firearm as described in the superseding indictment; that is, a PPSh machine gun.
>
> Second, that the firearm the defendant possessed or transferred was a machinegun as I have defined for you.
>
> And No. 3–as I will define for you—and the defendant acted knowingly.

(JA 821).

The instructions go on, but structurally only as to Count 2, proceeded to define "machine gun" first by reference to the first 3 definitions under the statute, but then to the remainder of the statute. (JA822).

This instruction fails as it never enumerates the particular characteristics *of the charged conduct*, but rather the possible characteristics of *anything chargeable under the statute*. This robs the instruction of the seriousness and specificity identified by *Freed* and then *Staples*. Appellant below raised *Staples* repeatedly and provided

51

proposed instructions based thereon, which the court below failed to give. (JA791).

Even as against other instructions found to be faulty, the one in the court below stands out as particularly incomplete. In *United States v. Montoya-Gaxiola*, the Ninth Circuit reversed a conviction where the jury was instructed that "First, the defendant knowingly received or possessed one Winchester, model 1200, 12 gauge shotgun, serial number L936588; and Second, the firearm was not registered to the defendant in the National Firearms Registration and Transfer Record. For purposes of this offense, the term "firearm" includes any shotgun having a barrel less than 18 inches." 796 F.3d 1118, 1123 (9th Cir. 2015). Each instruction below refers only to an alleged weapon by name, and never to specific characteristics under the Act.

Also instructive are the instructions were upheld in *Wonschik*, where the jury was instructed:

> in order to convict the defendant…, the government must prove each of the following elements beyond a reasonable doubt:
>
> *First*: That the defendant knowingly possessed a machine gun; and

*Second*: That the defendant knew that the Colt, Model SP1, .223 caliber, semi automatic rifle; and M16 bolt carrier, M16 hammers, M16A2 trigger, M16 disconnectors, disconnectors [sic] springs, and a three shot burst cam, was a combination of parts from which a machine gun can be assembled.

As used in this instruction, the term "machine gun" includes any weapon which shoots, is designed to shoot, or can readily be restored to shoot, automatically more than one shot without manual reloading, by a single function of the trigger. The term "machine gun" also includes any combination of parts from which a machine gun can be assembled if such parts are in the possession or under the control of a person.

353 F.3d at 1196.

The *Wonschik* instructions refer to the specific item by its sub-definition, and instruct the jury as to the specific sub-definition applicable under the Act. The instructions and indictment below, in contrast, never referred to any specific offense characteristics of any charged items, but rather left the jury free roam of a broad and ambiguous statute, leaving the jury at large to seek and find therein something to convict the defendant on. With respect to both the indictment and instructions, this is reversible error.

## V.  THE DISTRICT COURT IMPROPERLY APPLIED SENTENCE ENHANCEMENTS AND IMPROPERLY CALCULATED THE BASE OFFENSE LEVEL

Once again, the issues here stem largely from the defective indictment. Although appellate courts "accord due deference to a district court's application of the sentencing guidelines, our standard of review depends on whether a given dispute is mostly legal or factual. If the issue on appeal turns primarily on a factual determination, we apply the 'clearly erroneous' standard. In contrast, if the issue turns primarily on the legal interpretation of a guideline term, the standard moves closer to *de novo* review." *United States v. Pettus*, 90 F.4th 282, 285 (4th Cir. 2024) (cleaned up). The sentencing issues posed by the district court include[6]:

---

[6] Appellant notes some comments made at sentencing consistent with an abuse of discretion. For one, the district court observed that, pertaining to Appellant's discharge from the Navy "You wouldn't get a general discharge. This is more than bad conduct. So probably an other than honorable discharge." (JA2226-2227). Appellant notes he was discharged from the Navy **with full honors** after a thorough hearing.

Further, the district court observed "you gave an eloquent allocution which is consistent with you not being guilty, I just was wondering how come you didn't plead not guilty and talk to the jury the way you talked to me?" (JA2220).

The district court chided three times that it was "glad you got caught." JA2221, 2225.

54

### a. The District Court Improperly Applied a Fifteen-Level Enhancement Under U.S.S.G. § 2K2.1(b)(3)(A).

Appellant objected to the enhancement in its position paper (JA2017), citing *Blackburn* for the position that a defendant can only face a sentencing enhancement for a destructive device that was *actually complete and dangerous*. (JA2017). The district court purported to distinguish *Blackburn* by suggesting that *Blackburn* "only reviews 26 U.S.C. § 5845(f)(1) and (3)" as opposed to (2). JA2259. This, again was erroneous in that the indictment charged without specificity, and the jury was instructed as to the entire statute, not just (2). *Supra* Part I(b). Indeed, the enhancement was erroneous because a sentencing factor that wasn't properly indicted or proven cannot hold. *Jones v. United States*, 526 U.S. 227, 232 (1999). Here, it cannot be stated under what theory the jury convicted under, much less that it was proven beyond a reasonable doubt that the item was a device subject to § 2K2.1(b)(3)(A). Especially where it was previously a 2-level enhancement for *all* destructive devices.

---

And finally, "you're not connected to a mass shooting, but **you would have to be blind, deaf, and living in a hole not to realize what these types of weapons are doing to our country**. So I throw that out there." JA2222.

Clearly the amendment was intended to hone in on the seriousness of a *particular* destructive device, which the record cannot reflect that Appellant was convicted of.

### b. Similarly, the District Court Improperly Counted 29 Purported "Firearms" In Calculating the Offense Level

The government included 29 items, which were not tried, in its offense level calculations. This was objected to at sentencing. (JA2157). The total number of firearms attributed was 33, this consisted of, to wit, the 5 "firearms" subject to the charge and conviction, 6 cut "receivers" purchased by the CI, and 22 other items seized by the ATF and claimed to be "firearms," which included air guns, and non-firing replicas. (JA1827; JA2171-75).

"[T]he government's request for the application of an aggravating factor to the guideline sentence calculation must be based on some evidence. The [government] cannot meet [its] burden simply by offering conclusory statements.... While the finding of the applicability of an aggravating factor is protected on appeal by the clearly erroneous standard of review, this protection does not extend to a determination made without any factual foundation." *United States v. Gordon*, 895 F.2d

932, 936 (4th Cir. 1990). Here, the only "foundation" were the legal conclusions offered by ATF in its report.

## VI. IF THE CHARGED STATUTES COVER APPELLANT'S CONDUCT, THEY ARE UNCLEAR ON THAT POINT AND MUST BE CONSTRUED NARROWLY

Appellant raised issues of vagueness and statutory interpretation implicating the rule of lenity at several stages. (JA48-50); (JA53). "A law can be impermissibly vague for either of two independent reasons. First, if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Second, if it authorizes or even encourages arbitrary and discriminatory enforcement." *Wollschlaeger v. Governor, Fla.*, 848 F.3d 1293, 1319 (11th Cir. 2017) (cleaned up).

In no event would a reasonably intelligent person foresee that the conduct charged in this case—collecting destroyed, inert relics—would be deemed criminal. As applied against Appellant, 26 §§ U.S.C. 5861(d) 5871, 5845, and 5841 are unconstitutionally vague under the Fifth Amendment.

### a. § 5845 (b) and (f) ARE AMBIGUOUS AS APPLIED TO APPELLANT

57

Courts have considered two standards for whether a statute is sufficiently ambiguous to trigger the rule of lenity, though the Supreme Court has not made it clear which governs the rule of lenity. One standard asks whether there exists a "reasonable doubt" as to the statute's meaning. *See Moskal v. United States*, 498 U.S. 103, 108 (1990). The other inquires whether there is a "grievous ambiguity" in the statute. *See, e.g.*, *Chapman v. United States*, 500 U.S. 453, 463 (1991). It matters naught, however, which standard applies because, as the Sixth Circuit has held, § 5845 (b) is sufficiently ambiguous to necessitate the rule of lenity under "the more stringent 'grievously ambiguous' condition." *Cargill v. Garland*, 57 F.4th 447, 469 (5th Cir.), *cert. granted*, 144 S. Ct. 374 (2023). "Before courts may send people to prison, we owe them an independent determination that the law actually forbids their conduct." *Geudes v. ATF*, 140 S. Ct. 789, 790 (2020) (Gorsuch, J., statement respecting denial of writ of certiorari). As the Supreme Court wrote in *Babbit*:

> We have applied the rule of lenity in a case raising a narrow question concerning the application of a statute that contains criminal sanctions to a specific factual dispute . . . where no regulation was present.

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 704 n.18 (1995).

It is clear given the district court's submission of the fundamental legal question of what, if any, definitions under §5845(b) and (f) any of the charged items fall under that the district court was "so unsure" that it would ask the jury to "simply guess as to what Congress intended," thus amounting to a grievous ambiguity. *Maracich v. Spears*, 570 U.S. 48, 76 (2013).

Like in *Cargill*, where the National Firearms Act was held not to unambiguously criminalize the possession of a non-mechanical stock, the same Act cannot unambiguously criminalize inert, inoperable relics.

## VII. COUNSEL FOR APPELLANT PROVIDED CONSTITUTIONALLY INEFFECTIVE ASSISTANCE AT TRIAL

An ineffective assistance of counsel claim is cognizable on direct appeal when the record demonstrates that the defense lawyer failed to provide effective representation. *See United States v. Benton*, 523 F.3d 424, 435 (4th Cir. 2008). This Court will entertain such claims on direct appeal "where the record conclusively establishes ineffective assistance."

*United States v. Baptiste*, 596 F.3d 214, 216 n.1 (4th Cir. 2010). Where, as here, an "ineffective assistance of counsel claim rests on trial counsel's failure to call particular witnesses, expert or otherwise, [this Court] require[s] 'a specific proffer . . . as to what an expert witness would have testified.'" In his Notice of Expert Witness (JA115-117) Adamiak proffered that Daniel G. O'Kelly a firearms expert would testify to the history of the Model PPSh41, and it was his opinion that the PPSH41 in this case cannot be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of a trigger.

Mr. O'Kelly further opined that to functionally destroy a M79 and M203 so that they could be used as non-firearm display pieces, would require a person to obtain both the barrel and the receiver, O'Kelly would further opine that the RPG7's in this case were deactivated and inoperable and that the M230 and M79 in this case were removed from the purview of the NFA by virtue of the barrels being removed prior to Adamiak's possession of same. The failure of trial counsel to timely comply with the expert witness notice as set forth in paragraph 8 of the Discovery Order (JA24-28) and Federal Rules of Evidence 702, 703, and 705 and the Sentencing Procedures Order (JA838-840) was prejudicial,

60

especially where the government rested almost exclusively on ATF opinion evidence. Furthermore, the failure to object to the government's repeated solicitation of legal conclusions from its experts was significant. In this case, trial counsel provided ineffective assistance in failing to call as a witness Daniel G. O'Kelly, whom trial counsel had named in Adamiak's October 10, 2022 Notice of Expert Witness as a firearms expert, but failed to properly comply with trial court orders. (JA24-28); and in allowing the government to proffer numerous conclusions of law from its witnesses without objection.

## VIII. IF THE CHARGED ITEMS FALL WITHIN § 5845, ITS APPLICATION VIOLATES THE SECOND AMENDMENT

Appellant raised as-applied Second Amendment concerns at several stages of the proceedings below. (JA57). The district court denied these motions, (JA102), and entered final judgment terminating the claims of the parties. (JA2269). The Supreme Court's landmark *Bruen* decision came down during the proceedings below, which laid out a clear legal standard for the evaluation of acts regulating the peaceable keeping and bearing of arms. *Bruen* identified the Court of Appeals "coalesce[ing] around a 'two-step' framework for analyzing Second Amendment

challenges that combines history with means-end scrutiny," the Court identified this as "one step too many[.]"*Bruen*, 597 U.S. 1, 2. *Bruen* articulated that "when the Second Amendment's plain text covers an individual's conduct, the Constitution **presumptively protects** that conduct. The Government **must *then*** justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearms regulation. **Only then** may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id.* (cleaned up) (emphasis added).

As Appellant predicted in his motion to dismiss the indictment, the government argued the destroyed relics at issue to be "beyond the scope of the Second Amendment by attempting to characterize them as 'dangerous and unusual,' as it has in other cases, but this is not the test. (JA86). The court's oft-misunderstood invocation of 'dangerous and unusual' weapons—itself a reference to the statute of Northampton, which merely forbid the *carrying* of such weapons *in a particular manner*—in *Heller* and subsequently *Bruen* was for the purpose of discussion of what *might be* a constitutionally acceptable law, rather than the endorsement of any particular extant policy. Indeed, it is clear that

the *Heller* dicta, misconstrued by the government as a test, was simply the Court cautioning that it was not "undertak[ing] an exhaustive historical analysis…of the full scope of the Second Amendment[.]" *Bruen*, 597 U.S. 1, 21 (quoting *District of Columbia v. Heller*, 554 U.S. 570 at 627 (2008)).

The Second Amendment analysis is made difficult by the district court's refusal to make the legal determinations discussed above. They key question, under *Bruen*, is whether the regulated item falls within the "unqualified command" of the Second Amendment, *viz*, whether it is an "arm." Arms, as contemplated by the Second Amendment, are not limited to firearms or offensive weapons, but includes defensive instruments and accoutrement. *See, e.g.*, *Caetano v. Massachusetts*, 577 U.S. 411 (2016) (stun guns); *Miller v. Bonta*, No. 19CV01537BENJLB, 2023 WL 6929336, at *11 (S.D. Cal. Oct. 19, 2023) (ammunition magazines). The Second Amendment's implication hinges upon the answer to the legal question of whether or not the destroyed relics are within the purview § 5845(b) and (f). Appellant contends that it is not, but if this Court finds otherwise, then it necessarily becomes an arm, thus falling within the Second Amendment's "unqualified command."

The district court short-circuited the *Bruen* test and relied on pre-*Bruen* caselaw applying means-end scrutiny, in exact contravention of *Bruen*, and applied a "common use test"—which is not the test under *Bruen* and was also undeveloped under *Caetano*.[7] Whether or not the articles at issue were "weapons," whether one was a "machinegun," whether it was a "combination of parts," whether the rest were "destructive devices," and if so, what type, and whether they—whatever they are—were "dangerous and unusual" are questions of law the court failed to address. The district court cannot simultaneously leave the question of whether the affected articles were "firearms" in the § 5845 context to the jury and dispense with Second Amendment concerns by presupposing their prohibition to be without the scope of the Second Amendment.

Even in its reliance on pre-*Bruen* caselaw, the district court exclusively relied upon cases where there was no question as to whether the charged item was a machinegun or destructive device, while simultaneously submitting the legal question of whether *these items* were §5845 firearms to the jury. It cannot stand that the district court

64

could relieve the government of its burden under *Bruen* by presupposing that—in an as-applied challenge—the conduct simply fell beyond the scope of the Second Amendment without engaging in the requisite analysis.

The true test under *Bruen* is whether a historical analogue exists to the challenged conduct, here, the treatment of inoperable relics as if they were § 5845 "firearms," then an analysis of *how and why* the purported analogue operated similarly to *how and why* the challenged law operates. Appellant contends that if the inoperable relics here are regulable under § 5845, there is no historical tradition of regulating inert objects—or things that might someday, maybe, with welding and material alteration—become weapons, consistent with the Second Amendment, and the district court erred in failing to so hold.

## **CONCLUSION**

For all the reasons set forth above, appellant Adamiak respectfully requests this Honorable Court reverse the judgment and sentences imposed in this case and remand the case to the district court with instructions to enter a judgment of acquittal, or, in the alternative, reverse the judgment and sentence of the district court with instructions to dismiss the indictment with prejudice.

Respectfully submitted,

/s/ Matthew Larosiere
Matthew Larosiere, Esq.
6964 Houlton Circle
Lake Worth, FL 33467
Email: larosieremm@gmail.com
Telephone: 561-452-7575
*Counsel for Appellant*

### CERTIFICATE OF COMPLIANCE WITH RULE 32(A)

The undersigned certifies, pursuant to 4th Cir. Rule 28-1, that this brief complies with the type-volume limitation of the Federal Rule of Appellate Procedure (32)(a) because it contains 12,976 words, excluding the parts exempted by Rule 32(f). This brief complies with the typeface requirements and type style requirements for Rule 32(a) because it has been prepared in a proportionally-based typeface with Microsoft Word 2023 in 14 point, Century Schoolbook font.

/s/ Matthew Larosiere
Matthew Larosiere, Esq.
6964 Houlton Circle
Lake Worth, FL 33467
Email: larosieremm@gmail.com
Telephone: 561-452-7575
*Counsel for Appellant*

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was sent by CM/ECF on April 25, 2024, and notice of this filing was electronically served on all parties there registered for service, including:

JACQUELINE BECHARA,
*Assistant United States Attorney*

No paper copies are being furnished due to the Court's March 18, 2024 order. (Doc. 54)

/s/ Matthew Larosiere
Matthew Larosiere, Esq.
6964 Houlton Circle
Lake Worth, FL 33467
Email: larosieremm@gmail.com
Telephone: 561-452-7575
*Counsel for Appellant*
