IN THE
UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

———————————

No. 23-4451

———————————

UNITED STATES OF AMERICA,

*Appellee*,

v.

PATRICK TATE ADAMIAK,

*Appellant*.

———————————

Appeal from the United States District Court
for the Eastern District of Virginia
at Norfolk
*The Honorable Arenda L. Wright Allen, District Judge*

———————————

BRIEF OF THE UNITED STATES

———————————

Jessica D. Aber
United States Attorney

Jacqueline R. Bechara
Assistant United States Attorney
2100 Jamieson Avenue
Alexandria, Virginia 22314
(703) 299-3700

*Attorneys for the United States of America*

# Table of Contents

**Page**

Table of Authorities ................................................................. iii

Introduction ............................................................................1

Issues Presented ......................................................................2

Statement of the Case..............................................................3

    A.   Using a confidential informant, ATF buys machineguns from Adamiak. ........................................................................3

    B.   ATF finds destructive devices and machineguns in Adamiak's house.......................................................................6

    C.   A jury finds Adamiak guilty of five counts. .......................10

    D.   The district court sentences Adamiak to 240 months' imprisonment.........................................................12

Summary of Argument .........................................................14

Argument...............................................................................17

I.    The district court properly denied Adamiak's motion to dismiss. ...............17

    A.   The indictment sufficiently alleged the elements of the charged offenses.....................................................18

    B.   Section 5845 is not unconstitutionally vague as applied to Adamiak. ........................................................22

    C.   Section 5845 does not violate the Second Amendment as applied to Adamiak. ................................................26

II.    The district court properly instructed the jury.............................30

i

III.    Sufficient evidence supports Adamiak's convictions. .................................35

    A.    Sufficient evidence supports Adamiak's convictions for possession of an unregistered machinegun. ........................................37

    B.    Sufficient evidence supports Adamiak's convictions for possession of unregistered destructive devices. ................................44

IV.    The district court's sentence of 240 months' imprisonment is procedurally reasonable. ................................................................49

    A.    The district court did not clearly err in finding 33 firearms attributable to Adamiak. ......................................................50

    B.    The district court properly applied the fifteen-level destructive device enhancement. ...............................................52

    C.    Any error in the district court's calculation of the Guidelines range was harmless. ..............................................................54

V.    The record does not conclusively establish that Adamiak's trial counsel rendered ineffective assistance. .......................................57

Conclusion ...........................................................................................59

Statement Regarding Oral Argument .....................................................60

Certificate of Compliance ......................................................................60

ii

## Table of Authorities

Page

### Cases

*Barber v. Thomas*, 560 U.S. 474 (2010) ...................................................25

*Bevis v. City of Naperville*, 85 F.4th 1175 (7th Cir. 2023) ....................29

*Cox v. United States*, No. CR11-022RJB,
  2023 WL 4203261 (D. Alaska June 27, 2023) ..............................30

*District of Columbia v. Heller*, 554 U.S. 570 (2008) ...................... 28, 29

*Greer v. United States*, 593 U.S. 503 (2021) ..................................... 34, 35

*Hamling v. United States*, 418 U.S. 87 (1974) ......................................18

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ......................23

*Kolbe v. Hogan*, 849 F.3d 114 (4th Cir. 2017) (en banc) ......................29

*Muscarello v. United States*, 524 U.S. 125 (1998) ................................25

*N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022) .................. 27, 29

*Robbins v. United States*, 476 F.2d 26 (10th Cir. 1973) ................... 19, 21

*Staples v. United States*, 511 U.S. 600 (1994) ......................... 15, 31, 37

*United States v. Aiken*, 974 F.2d 446 (4th Cir. 1992) ..............................1

*United States v. Askew*, 98 F.4th 116 (4th Cir. 2024) ............................31

*United States v. Baptiste*, 596 F.3d 214 (4th Cir. 2010) .........................57

*United States v. Benkahla*, 530 F.3d 300 (4th Cir. 2008) ......................53

*United States v. Berger*, — F. Supp. 3d —,
  2024 WL 449247 (E.D. Pa. Feb. 6, 2024) .....................................30

*United States v. Blackburn*, 940 F.2d 107 (4th Cir. 1991) .............. 52, 53

*United States v. Bishop*, 926 F.3d 621 (10th Cir. 2019) .........................58

*United States v. Boyd*, 55 F.4th 272 (4th Cir. 2022) ..............................26

*United States v. Buchanan*, 787 F.2d 477 (10th Cir. 1986) ...................58

*United States v. Campo*, 793 F.2d 1251 (11th Cir. 1986) (per curiam) .................36

*United States v. Carthorne*, 726 F.3d 503 (4th Cir. 2013) .....................34

*United States v. Curtis*, 520 F.2d 1300 (1st Cir. 1975) .........................19

*United States v. De La Paz-Rentas*, 613 F.3d 18 (1st Cir. 2010) ...........................36

*United States v. Dennis*, 19 F.4th 656 (4th Cir. 2021)...............................................3

*United States v. Doucet*, 994 F.2d 169 (5th Cir. 1993) ...........................................21

*United States v. Duroseau*, 26 F.4th 674 (4th Cir. 2022) ................................. 37, 44

*United States v. Emerson*, 432 F. Supp. 2d 128 (D. Me. 2006) ............................25

*United States v. Engle*, 676 F.3d 405 (4th Cir. 2012)................................. 17, 22, 27

*United States v. Fisher*, No. 1:23-cr-45,
    2024 WL 589115 (W.D.N.C. Feb. 13, 2024) ................................................30

*United States v. George*, 946 F.3d 643 (4th Cir. 2020) ..........................................25

*United States v. Gomez-Jimenez*, 750 F.3d 370 (4th Cir. 2014)...................... 54, 56

*United States v. Gonzales*, 121 F.3d 928 (5th Cir. 1997) ........................................40

*United States v. Hargrove*, 701 F.3d 156 (4th Cir. 2012) .......................................54

*United States v. Helem*, 186 F.3d 449 (4th Cir. 1999)............................................25

*United States v. Hill*, 700 F. App'x 235 (4th Cir. 2017)..........................................27

*United States v. Hoover*, 635 F. Supp. 3d 1305 (M.D. Fla. 2022) ............. 21, 36, 40

*United States v. Hosford*, 843 F.3d 161 (4th Cir. 2016) .........................................22

*United States v. Hsu*, 364 F.3d 192 (4th Cir. 2004)................................................22

*United States v. Jackson*, 124 F.3d 607 (4th Cir. 1997) .................................. 31, 32

*United States v. Jamison*, 635 F.3d 962 (7th Cir. 2011)..........................................36

*United States v. Johnson*, 718 F.2d 1317 (5th Cir. 1983) (en banc)........................36

*United States v. Just*, 74 F.3d 902 (8th Cir. 1996)..................................................20

*United States v. Kent*, 175 F.3d 870 (11th Cir. 1999) ............................................47

*United States v. Kuzma*, 967 F.3d 959 (9th Cir. 2020) .................................... 40, 44

*United States v. Lane*, 689 F. Supp. 3d 232 (E.D. Va. 2023) .................................30

*United States v. Mann*, 701 F.3d 274 (8th Cir. 2012)..............................................44

*United States v. Marshall*, 872 F.3d 213 (4th Cir. 2017) .......................................17

*United States v. McKenzie-Gude*, 671 F.3d 452 (4th Cir. 2011)............................49

*United States v. Medley*, 34 F.4th 326 (4th Cir. 2022) ..........................................50

*United States v. Miller*, 307 U.S. 174 (1939) ................................................. 28, 29

*United States v. Miltier*, 882 F.3d 81 (4th Cir. 2018) ........................................ 30, 31

*United States v. Mink*, 9 F.4th 590 (8th Cir. 2021) ................................................... 33

*United States v. Morris*, 917 F.3d 818 (4th Cir. 2019) .............................................. 58

*United States v. Neal*, 692 F.2d 1296 (10th Cir. 1982) .............................................. 19

*United States v. Nieves*, 108 F. App'x 790 (4th Cir. 2004) (per curiam) ................. 21

*United States v. O'Brien*, 560 U.S. 218 (2010) ......................................................... 40

*United States v. Olano*, 507 U.S. 725 (1993) ............................................................ 20

*United States v. One TRW, Model M14, 7.62 Caliber Rifle*,
   441 F.3d 416 (6th Cir. 2006) ................................................................................. 39

*United States v. Pena-Lora*, 225 F.3d 17 (1st Cir. 2000) ......................................... 39

*United States v. Pennington*, 168 F.3d 1060 (8th Cir. 1999) .................................... 21

*United States v. Pérez-Greaux*, 83 F.4th 1 (1st Cir. 2023) ...................................... 43

*United States v. Perry*, 757 F.3d 166 (4th Cir. 2014) ............................................... 17

*United States v. Price*, 877 F.2d 334 (5th Cir. 1989) ................................................ 33

*United States v. Rahimi*, 602 U.S. —, 144 S. Ct. 1889 (2024) ................................ 28

*United States v. Randall*, 171 F.3d 195 (4th Cir. 1999) ........................................... 22

*United States v. Rohwedder*, 243 F.3d 423 (8th Cir. 2001) ...................................... 49

*United States v. Seigler*, 990 F.3d 331 (4th Cir. 2021) ............................................. 35

*United States v. Shaw*, 670 F.3d 360 (1st Cir. 2012) ................................................ 43

*United States v. Simien*, 655 F. Supp. 3d 540 (W.D. Tex. 2023) ............................. 30

*United States v. Slocum*, 106 F.4th 308 (4th Cir. 2024) ........................................... 57

*United States v. Smith*, 21 F.4th 122 (4th Cir. 2021) ................................................ 35

*United States v. Smith*, 44 F.3d 1259 (4th Cir. 1995) ............................................... 34

*United States v. Smith*, 477 F.2d 399 (8th Cir. 1973) ............................................... 39

*United States v. Taylor-Sanders*, 88 F.4th 516 (4th Cir. 2023) ......................... 23, 51

*United States v. Teeter*, 561 F.3d 768 (8th Cir. 2009) .............................................. 52

*United States v. Teston*, — F. Supp. 3d —,
   2024 WL 1621512 (D.N.M. Apr. 15, 2024) ......................................................... 30

*United States v. Tipton*, 90 F.3d 861 (4th Cir. 1996) ................................................ 44

*United States v. Was*, 684 F. Supp. 350 (D. Conn. 1988)........................................36

*United States v. Washington*, 146 F.3d 219 (4th Cir. 1998)...................................51

*United States v. Weaver*, 659 F.3d 353 (4th Cir. 2011).......................................26

*United States v. Williams*, 364 F.3d 556 (4th Cir. 2004)......................................24

*United States v. Willis*, 992 F.2d 489 (4th Cir. 1993).........................................39

*United States v. Wonschik*, 353 F.3d 1192 (10th Cir. 2004) ...............................21

*United States v. Woods*, 560 F.2d 660 (5th Cir. 1977).........................................47

**Statutes**

18 U.S.C. § 921(a)(3)..............................................................................................39

18 U.S.C. § 921(a)(24)............................................................................................20

18 U.S.C. § 922(o) ...................................................................... 19, 20, 21, 43

18 U.S.C. § 924(c)...................................................................................................22

18 U.S.C. § 1346......................................................................................................21

18 U.S.C. § 3553(a) ...................................................................................... 14, 56

26 U.S.C. § 5841.......................................................................................................1

26 U.S.C. § 5845(b) ....................................................................................... passim

26 U.S.C. § 5845(f) ........................................................................................ passim

26 U.S.C. § 5861(d) ........................................................................ 18, 19, 21, 43

**Other Authorities**

U.S.S.G. § 2K2.1(b)(1) ................................................................................. passim

U.S.S.G. § 2K2.1(b)(3) ........................................................... 13, 52, 54, 55

U.S.S.G. ch. 5 pt. A.................................................................................................55

**Rules**

Fed. R. Crim. P. 7(c) ...............................................................................................18

Fed. R. Crim. P. 12(b)..............................................................................................17

Fed. R. Crim. P. 30(d)..............................................................................................32

Fed. R. Crim. P. 52(b)..............................................................................................20

**Constitutional Provisions**

U.S. Const. amend. II ................................................................................27

**Introduction**

The National Firearms Act ("NFA"), 26 U.S.C. §§ 5801–5871, "regulates the manufacture, sale, and transfer of certain specially dangerous and concealable weapons." *United States v. Aiken*, 974 F.2d 446, 447 (4th Cir. 1992). The NFA requires firearms manufacturers, importers, and makers to register their firearms with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") in the National Firearms Registration and Transfer Record. 26 U.S.C. § 5841(b). To transfer the firearm, the transferor must "identify itself, the firearm, and the transferee, and apply for and receive approval from" ATF. *Aiken*, 974 F.2d at 447. Firearms subject to the NFA include machineguns and destructive devices. *See* 26 U.S.C. § 5845.

Patrick Adamiak developed extensive knowledge of firearms through his service in the United States Navy. He started a business, Black Dog Arsenal, and sold unregistered firearms and firearm parts over the Internet for several years. In late 2021 and early 2022, ATF conducted a series of controlled buys of machinegun receivers and a complete PPSh-41 machinegun from Adamiak. ATF then executed a search warrant on Adamiak's house, where agents found an M79 grenade launcher, an M203 grenade launcher, and two RPG-7 anti-tank missile launchers. These firearms were not registered to Adamiak.

1

A grand jury charged Adamiak with receiving and possessing an unregistered firearm, possessing and transferring a machinegun, and three counts of receiving and possessing unregistered destructive devices. In October 2022, Adamiak proceeded to trial, where a jury found him guilty of all counts. The district court sentenced him below the advisory Guidelines range to 240 months' imprisonment.

Adamiak raises five challenges to his convictions and sentence in this direct appeal. Because these claims lack merit, the Court should affirm.

## Issues Presented

1.    Did the district court properly deny Adamiak's motion to dismiss the superseding indictment?

2.    Did the district court properly instruct the jury on the knowledge element of the offenses?

3.    Does sufficient evidence support Adamiak's convictions?

4.    Did the district court properly calculate the advisory Guidelines range? Alternatively, was any error harmless?

5.    Does the record fail to conclusively establish that Adamiak's trial counsel rendered ineffective assistance?

**Statement of the Case**

### A.    Using a confidential informant, ATF buys machineguns from Adamiak.

Viewed "in the light most favorable to the government," the "evidence adduced at trial established the following facts." *United States v. Dennis*, 19 F.4th 656, 660 (4th Cir. 2021).  Around November 2020, Adamiak started buying firearm parts online from Gregory Pruess, who operated a gun store in North Carolina.  JA496–498.  Adamiak purchased "[v]arious types of stocks, barrels, [and] bolts," which did not have to be registered under the NFA.  JA497.  Adamiak conducted transactions in the name of his business, "Black Dog Arsenal."  JA499.  Eventually, Pruess started selling bulk quantities of parts to Adamiak, who then advertised and resold them online.  JA498–500.  Over the course of about a year, Adamiak purchased "thousands of parts" totaling about $60,000 or $70,000.  JA499.  Based on their conversations, Pruess assessed Adamiak to be "[v]ery knowledgeable" about firearms.  JA500.

In July 2021, Pruess was traveling through Virginia and met Adamiak at his house in Virginia Beach.  JA500–501.  In the garage, Pruess observed "a Mark 19 grenade launcher" and asked whether Adamiak "had a license to possess those."  JA502.  Adamiak said that "he was planning on getting one," JA502, but "seemed pretty indifferent to doing anything about it," JA503.  Pruess told him that, if

3

Adamiak "did any work to it or tried to assemble it, it would be a destructive device." JA502.

ATF later searched Pruess's house and found that he unlawfully possessed two pistols and a rifle. JA503. ATF asked Pruess to cooperate in order to avoid criminal charges, and he agreed. JA503–504. ATF ultimately paid Pruess about $8,000 for his cooperation. JA504.

In October 2021, Pruess informed ATF Special Agent William Hairston that Adamiak was trafficking machineguns over the internet. JA367, JA506. Specifically, Adamiak was selling unregistered machineguns on gunbroker.com, the equivalent of eBay for firearms. JA499–500. Pruess also informed Agent Hairston that Pruess had "observed what he thought were destructive devices" in Adamiak's house. JA368.

Agent Hairston directed Pruess to create an email account using a fake name, "Rick Hayes," to communicate with Adamiak without revealing Pruess's identity. JA368–369. Pruess, acting as Rick Hayes, contacted Adamiak and expressed interest in "any kind of saw-cut machine guns that were easily put back together." JA507.

In November 2021, ATF used Pruess to purchase a PPSh-41 machinegun receiver from Adamiak for $2,200. JA369. The receiver had a "single saw cut, making it into two pieces." JA374. Ordinarily, a destroyed machinegun receiver

4

would be cut with a torch so that it would require "a great deal of work to put back together." JA510. A saw cut, however, leaves the receiver "easy to put back together with a minimal amount of effort." JA510.

On a second occasion in November 2021, ATF used Pruess to purchase five PPS-43 machinegun receivers from Adamiak for $7,050. JA375–376. Each receiver had a single saw cut. JA378–382. In December 2021, ATF again used Pruess to purchase an RPD machinegun receiver from Adamiak for $3,000. JA382–383. The receiver had a single saw cut. JA386.

Finally, in March 2022, ATF used Pruess to purchase a complete PPSh-41 machinegun from Adamiak for $3,000. JA386–388. The machinegun was "disassembled but complete," JA389, and the receiver had a single saw cut, JA390. This photograph depicted the disassembled components:



5

JA2306.

Pruess observed that the machinegun was "ready to put back together, no other parts [] required." JA521. He estimated that it would take "a few minutes" to assemble the gun "so it would fire," and about thirty minutes to polish and refinish it "so you would never tell it was ever even cut." JA522. This photograph depicted how the machinegun would have looked upon assembly:



JA2307.

### B. ATF finds destructive devices and machineguns in Adamiak's house.

After the fourth controlled buy, Agent Hairston obtained a search warrant for Adamiak's house, which ATF executed in April 2022. JA392–393. Agents recovered three items of significance here.

First, agents found an M79 40mm grenade launcher:



JA2308.    Agent Hairston explained that the firearm "operates kind of like a break-action shotgun: You would just connect the barrel to the receiver and you have a complete, full M79 40mm grenade launcher."  JA395.  ATF found the M79 barrel concealed in a sock in a drawer in the living room, JA398, JA462, and the receiver stored in a safe in the office, JA404, JA463.

Second, agents found an M203 40mm grenade launcher with two barrels:



JA2309.  The M203 "is what the military uses currently" because it "can be attached to [the] bottom of an M-16 rifle," so that a person only has to carry the grenade launcher, rather than both a grenade launcher and a rifle.  JA525.  ATF found the M203 barrels in the office, JA461, and the receiver in the safe, JA471.

Third, agents found two RPG-7 anti-tank missile launchers in the office. JA401, JA466.



JA2315. The RPG-7, or "rocket-propelled grenade launcher," "shoots a rocket out to 920 meters," and is "designed to take out tanks[ and] armored personnel carriers." JA526.

ATF found several other items related to Adamiak's firearms business at his house. Inside the safe, agents recovered "several firearms," JA404, and cash, JA437. ATF found an operating manual for submachineguns, machineguns, and semiautomatic weapons, diagrams of machineguns and receivers, and machinist drawings for submachinegun frames. JA413–415, JA420–422, JA423–425. In the backyard, agents found machinegun shields in crates, which were consistent with

"something owned by the Navy." JA426. ATF found "a saw that could be used to make fine saw cuts," a welder, and a toolbox. JA428–429, JA431. Agents found "inert rockets," "similar to what you would fire using the RPG-7," JA427, and "a lot of ammunition," JA469. ATF recovered a stack of MAC flats, which could be folded up and welded together to form MAC receivers. JA431–433. Agents also found packing materials consistent with shipping firearms to customers, a spreadsheet tracking customer purchases, and money pouches containing cash. JA433–436. In total, ATF found over $22,000 in cash in Adamiak's house. JA437.

### C.    A jury finds Adamiak guilty of five counts.

In June 2022, a grand jury sitting in Norfolk, Virginia, returned a superseding indictment charging Adamiak with one count of receiving and possessing an unregistered firearm, in violation of 26 U.S.C. §§ 5841, 5845, 5861(d), and 5871 ("Count One"); one count of possessing and transferring a machinegun, in violation of 18 U.S.C. § 922(o) ("Count Two"); and three counts of receiving and possessing unregistered destructive devices, in violation of §§ 5841, 5845, 5861(d), and 5871 ("Counts Three, Four, and Five"). JA37–39. Counts One and Two pertained to the PPSh-41 machinegun Adamiak sold "Rick Hayes" in March 2022. *See* JA396. Counts Three, Four, and Five pertained to the M209 grenade launcher, the M203 grenade launcher, and the RPG-7 anti-tank missile launchers, respectively, found at Adamiak's house. *See* JA396, JA401–402.

10

Before trial, Adamiak moved to dismiss the superseding indictment, arguing that it failed to sufficiently allege the elements of the charged offenses and that the charged provisions were unconstitutionally vague and violated the Second Amendment. JA51–62. The district court denied his motion. JA94–102.

In October 2022, Adamiak proceeded to a jury trial. Agent Hairston and Pruess described the events summarized above. Agent Hairston testified that a business must obtain a federal firearms license ("FFL") from ATF to sell or manufacture firearms. JA438–439. Likewise, a business must obtain a federal explosives license ("FEL") from ATF to deal or import explosives. JA440. Further, a business must obtain a special occupational tax ("SOT") from ATF to conduct business involving NFA weapons such as machineguns, grenade launchers, and missile launchers. JA440. Adamiak did not have an FFL, an FEL, or an SOT. JA439–441.

ATF records showed that Adamiak had previously registered a short-barreled shotgun and a few silencers. JA418, JA441–442. However, Adamiak had not registered the firearms charged in Counts One through Five, and he had no registration applications pending with ATF. JA443–444.

The government called ATF Firearms Enforcement Officers Ronald Davis and Jeff Bodell, who testified as experts in firearm classification and identification. JA575, JA632. Davis examined the PPSh-41 and explained his conclusion that the

11

firearm was a machinegun.  JA578–590.  Bodell examined 32 items recovered from Adamiak's house.  JA632.  He explained his conclusions that the M79 grenade launcher, the M203 grenade launcher, and the RPG-7 anti-tank missile launchers were destructive devices.  JA634–639.

The jury also heard testimony regarding Adamiak's familiarity with firearms. Christopher Schramm, the operations manager at a firearms retailer in Virginia Beach, testified that Adamiak had visited his store for 20–30 firearms transfers over about six years.  JA692.  Schramm talked to Adamiak during these visits and gathered that Adamiak was knowledgeable about firearms.  JA693.  The government also called United States Navy Command Master Chief Clayton Alek-Finkelman, who testified as an expert in Naval weapons training and war-fighting readiness. JA710.  Master Chief Alek-Finkelman reviewed Adamiak's training record and observed that Adamiak had "a high level of weapons training."  JA717.

At the conclusion of the government's case, Adamiak moved for a judgment of acquittal under Federal Rule of Criminal Procedure 29.  JA762–768.  The district court denied his motion.  JA771–774.  After deliberating for two hours, the jury found Adamiak guilty on all counts.  JA828–829.

### D.    The district court sentences Adamiak to 240 months' imprisonment.

Before sentencing, the United States Probation Office prepared a presentence report ("PSR").  As relevant here, Adamiak objected to the PSR attributing him with

12

982 firearms, producing a ten-level enhancement under U.S.S.G. § 2K2.1(b)(1)(E) for an offense involving 200 or more firearms. JA841–848. He also objected to the application of a fifteen-level enhancement under U.S.S.G. § 2K2.1(b)(3)(A) for an offense involving "a destructive device that is a portable rocket, a missile, or a device for use in launching a portable rocket or missile." JA849–851. In support of its sentencing position, the government submitted a second report prepared by Officer Bodell, who determined that 23 of the uncharged items recovered from Adamiak's house qualified as firearms. JA1847–1852.

In June 2023, the district court conducted a sentencing hearing. Master Chief Alek-Finkelman testified that, in December 2022, Adamiak's friend, Adam Myers, posted the government's witness list on Facebook. JA2047. The post implied that, because of Master Chief Alek-Finkelman's testimony, "sailors are going to commit suicide in the Navy." JA2047. Similarly, Agent Hairston testified that, after the trial, he received a call from Pruess, who stated that there was a video on YouTube identifying Pruess. JA2093–2094. Agent Hairston obtained records of Adamiak's jail calls, in which he discussed with Myers the "need to get these videos out." JA2096.

The government also called Officer Bodell, who opined that the MAC flats recovered from Adamiak's house qualified as firearms. JA2073–2078. Adamiak

called Daniel O'Kelly, a former ATF agent, who opined that the MAC flats did not satisfy the statutory definition of a firearm. JA2139–2144.

Ultimately, the district court sustained Adamiak's objection regarding the MAC flats, finding that they did not constitute firearms. JA2261–2264. Simultaneously, the court sustained the government's objection regarding the 23 firearms found in Adamiak's house. JA2241–2242. The court also overruled Adamiak's objection to the applicability of the fifteen-level destructive device enhancement. JA2254–2259. Based on a total offense level of 43 and a criminal history category of I, Adamiak's advisory Guidelines range was 600 months' imprisonment. JA2176. After a thorough analysis of the 18 U.S.C. § 3553(a) factors, the court sentenced Adamiak to 240 months' imprisonment and 3 years' supervised release. JA2227. The court underscored that "it would have imposed the same sentence . . . regardless of the outcome of the objections." JA2265. Adamiak filed a timely notice of appeal. JA2275.

## Summary of Argument

1.    The district court properly denied Adamiak's motion to dismiss. The superseding indictment sufficiently alleged the offenses using the language of the charged statutes, and the indictment was not required to specify the applicable definitions under 26 U.S.C. § 5845. Adamiak's as-applied vagueness challenge fails because a person of ordinary intelligence would understand that the PPSh-41

charged in Counts One and Two is a "machinegun," and that the M79 grenade launcher, the M203 grenade launcher, and the RPG-7 anti-tank missile launchers charged in Counts Three, Four, and Five, respectively, are "destructive device[s]." Because there was a factual dispute about whether the charged firearms satisfied the definitions in § 5845, the district court properly determined that it could not resolve Adamiak's as-applied Second Amendment challenge before trial.   Regardless, Adamiak's claim fails on the merits because the Second Amendment does not protect his possession of an unregistered machinegun, grenade launchers, and anti-tank missile launchers.

2.     The district court did not plainly err in instructing the jury on the knowledge element of the offenses.  Viewed as a whole, the instructions satisfied *Staples v. United States*, 511 U.S. 600 (1994), because they required the jury to find that Adamiak knew the characteristics of each firearm that brought it within the statutory definition of a "machinegun" or a "destructive device."

3.     Sufficient evidence supports Adamiak's convictions.  The testimony of Agent Hairston, Officer Davis, and Pruess established that the PPSh-41 is a "machinegun" because it is a "weapon" which "is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger."  § 5845(b).  Similarly, the testimony of Agent Hairston, Officer Bodell, and Pruess established that the grenade launchers

15

and anti-tank missile launchers were "destructive device[s]," because they were "weapon[s] . . . which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, the barrel or barrels of which have a bore of more than one-half inch in diameter." § 5845(f). Substantial circumstantial evidence, including Adamiak's extensive knowledge of firearms, his business selling expensive firearms in an unregulated market, his possession of firearms operating manuals and diagrams, and the multiple warnings he received about unregistered destructive devices, supported the inference that Adamiak had the requisite knowledge to sustain his convictions.

4.     The district court did not clearly err in finding, based on Agent Bodell's report, that 23 uncharged items found in Adamiak's house were "firearms," and applying the six-level enhancement under U.S.S.G. § 2K2.1(b)(1)(C) for an offense involving 25–99 firearms. The court also did not clearly err in finding that an RPG-7 anti-tank missile launcher is a "destructive device that is a portable rocket, a missile, or a device for use in launching a portable rocket or missile," and applying the fifteen-level enhancement under § 2K2.1(b)(3)(A). Ultimately, any error in the calculation of the Guidelines range is harmless because the district court expressly stated that it would have imposed the same sentence regardless of the resolution of the objections, and its 240-month sentence would be substantively reasonable given

the nature and circumstances of the offense and Adamiak's aggravating conduct pending sentencing.

5.    Adamiak's claim of ineffective assistance of counsel fails on direct appeal because the record does not conclusively establish that his trial counsel rendered constitutionally ineffective assistance.

## Argument

### I.    The district court properly denied Adamiak's motion to dismiss.

A defendant must raise before trial a claim that the indictment fails to state an offense.  *See* Fed. R. Crim. P. 12(b)(3)(B)(v).  This pretrial motion is "a challenge to the sufficiency of the indictment, which is ordinarily limited to the allegations contained in the indictment."  *United States v. Engle*, 676 F.3d 405, 415 (4th Cir. 2012).[1]  "A district court may dismiss an indictment under Rule 12 where there is an infirmity of law in the prosecution," but "a court may not dismiss an indictment . . . on a determination of facts that should have been developed at trial." *Id.*  This Court "review[s] the district court's factual findings on a motion to dismiss an indictment for clear error" and "review[s] its legal conclusions de novo."  *United States v. Perry*, 757 F.3d 166, 171 (4th Cir. 2014).  The Court may affirm the denial

---

[1] The government has omitted internal quotation marks, alterations, and citations throughout this brief, unless otherwise noted.  *See United States v. Marshall*, 872 F.3d 213, 217 n.6 (4th Cir. 2017).

of a motion to dismiss "on any ground appearing in the record." *Engle*, 676 F.3d at 415 n.5.

### A.    The indictment sufficiently alleged the elements of the charged offenses.

Adamiak maintains that the district court should have dismissed the indictment because it failed to sufficiently allege an offense. The indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charged." Fed. R. Crim. P. 7(c)(1). An indictment is sufficient if it (1) "contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend"; and (2) "enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." *Hamling v. United States*, 418 U.S. 87, 117 (1974). Generally, an indictment is sufficient if it "set[s] forth the offense in the words of the statute itself, as long as those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offen[s]e intended to be punished." *Id.*

Counts One, Three, Four, and Five charged violations of 26 U.S.C. § 5861(d), which makes it unlawful for a person "to receive or possess a firearm which is not registered to him in the National Firearms Registration and Transfer Record." Count One alleged that Adamiak knowingly received and possessed "a firearm, namely[,] a PPSH machinegun, which was not registered" to him. JA37. Count Three alleged

that Adamiak knowingly received and possessed "a destructive device, namely[,] a M79, 40 mm grenade launcher, which was not registered" to him. JA38. Count Four alleged that Adamiak knowingly received and possessed "a destructive device, namely[,] a M203, 40 mm grenade launcher, which was not registered" to him. JA38–39. Count Five alleged that Adamiak knowingly received and possessed "two destructive devices, namely[,] two RPG-7 variant recoilless antitank projectors, which were not registered" to him. JA39. All four counts cited 26 U.S.C. §§ 5841, 5845, 5861(d), and 5871. JA37–39.

Thus, Counts One, Three, Four, and Five sufficiently alleged the elements of offenses under § 5861(d). *See, e.g.*, *United States v. Neal*, 692 F.2d 1296, 1303 (10th Cir. 1982) (holding that indictment charging that the defendant possessed "a destructive device made from a one gallon plastic jug, a flammable liquid, and a rag wick" sufficiently alleged an offense under § 5861(d)); *United States v. Curtis*, 520 F.2d 1300, 1302 (1st Cir. 1975) (holding that indictment charging that the defendants possessed and transferred destructive devices, specifically, explosive bombs, sufficiently alleged offenses under §§ 5861(d) and (e)); *Robbins v. United States*, 476 F.2d 26, 30 (10th Cir. 1973) (holding that indictment charging that the defendant possessed a destructive device, specifically, a homemade incendiary bomb, sufficiently alleged an offense under § 5861(d)).

19

Similarly, Count Two charged a violation of 18 U.S.C. § 922(o), which makes it "unlawful for any person to transfer or possess a machinegun." The term "machinegun" under § 922(o) has the same meaning as it does under 26 U.S.C. § 5845(b). *See* 18 U.S.C. § 921(a)(24). Count Two alleged that Adamiak knowingly possessed and transferred "a machinegun, that is[,] a PPSH machinegun," in violation of § 922(o). JA38. Thus, Count Two sufficiently alleged the elements of an offense under § 922(o). *See, e.g.*, *United States v. Just*, 74 F.3d 902, 904 & n.2 (8th Cir. 1996) (holding that indictment charging that the defendant knowingly possessed and transferred a machinegun, specifically, "a Japanese, Type 99, 7.7 Japanese caliber machine gun," sufficiently alleged an offense under § 922(o)).

Adamiak nonetheless maintains that the superseding indictment was deficient. He claims that Counts One and Two failed to provide sufficient notice because the indictment did not specify which of the definitions in § 5845(b) the PPSh-41 machinegun satisfied. Def. Br. 11–16. Likewise, he argues that Counts Three, Four, and Five failed to sufficiently allege how the charged firearms satisfied the definition of a "destructive device" under § 5845(f). Def. Br. 17–19. Contrary to his claim (at 17), Adamiak did not raise this argument regarding Counts Three, Four, and Five in his motion to dismiss. *See* JA51–52 (challenging the sufficiency of the allegations supporting Counts One and Two). Therefore, this latter claim is reviewable only for plain error. *See* Fed. R. Crim. P. 52(b); *United States v. Olano*, 507 U.S. 725, 731–

20

32 (1993).  Because no authority supports his position, his claims fail under any standard of review.

Section 5845, captioned "[d]efinitions," is a definitional provision, not a criminal prohibition.  As relevant here, § 5845(b) defines the term "machinegun," and § 5845(f) defines the term "destructive device."  These definitions do not create additional elements of the offenses charged under §§ 5861(d) and 922(o).  Therefore, the government was not required to charge the applicable definition(s) in the indictment.  *See, e.g.*, *Robbins*, 476 F.2d at 30 (holding that an indictment under § 5861(d) need not refer to the definitions in § 5845 to "fairly notify a defendant of the charge against him"); *United States v. Hoover*, 635 F. Supp. 3d 1305, 1316 (M.D. Fla. 2022) (rejecting the argument that the government "was required to plead the specific facts supporting its contention that the [firearms] at issue fall within the definition of a machinegun"); *cf. United States v. Pennington*, 168 F.3d 1060, 1065 (8th Cir. 1999) ("The indictment's failure to cite [18 U.S.C.] § 1346, a definitional provision, and to use its specific term, 'honest' services, does not mean no crime was charged.").

Adamiak relies on several cases addressing claims of constructive amendment of the indictment.  *See United States v. Nieves*, 108 F. App'x 790, 793 (4th Cir. 2004) (per curiam); *see also United States v. Wonschik*, 353 F.3d 1192, 1197–98 (10th Cir. 2004); *United States v. Doucet*, 994 F.2d 169, 173 (5th Cir. 1993).  These cases

illustrate the undisputed proposition that, *if* the government charges an offense predicated on a specific theory in the indictment, then it cannot broaden the bases for conviction at trial without violating the defendant's right to indictment by a grand jury. *See, e.g.*, *United States v. Randall*, 171 F.3d 195, 210 (4th Cir. 1999) (holding that, although "the government was not required to specify on which [18 U.S.C.] § 924(c) predicate offense it was relying, because the government did indeed specify in the indictment that it was relying on the predicate offense of distribution, it was not allowed . . . to broaden the bases of conviction to include the different § 924(c) predicate offense of possession with intent to distribute"). None of these cases, however, supports the contention that an indictment *must* specify how the charged firearms satisfy the definitional provisions in § 5845.

### B.     Section 5845 is not unconstitutionally vague as applied to Adamiak.

Next, Adamiak renews his claim that §§ 5845(b) and (f) are unconstitutionally vague as applied to him. Def. Br. 57–59. To satisfy due process, a criminal statute must "define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *United States v. Hosford*, 843 F.3d 161, 170 (4th Cir. 2016). For an as-applied challenge, the Court must determine whether Adamiak "had fair notice that the statute . . . proscribed [his] conduct." *United States v. Hsu*, 364 F.3d 192, 196 (4th Cir. 2004). To obtain dismissal, Adamiak had

22

to show that, even if the allegations in the indictment were true, §§ 5845(b) and (f) are unconstitutionally vague as applied to him. *See Engle*, 676 F.3d at 415.

Adamiak asserts, without elaboration, that a reasonable person would not anticipate that "collecting destroyed, inert relics . . . would be deemed criminal." Def. Br. 57. "A party waives an argument by failing to present it in its opening brief or by failing to develop its argument—even if its brief takes a passing shot at the issue." *United States v. Taylor-Sanders*, 88 F.4th 516, 525 n.5 (4th Cir. 2023). But even if this argument is not waived, it lacks merit.

The Supreme Court has "struck down" as unconstitutionally vague "statutes that tied criminal culpability to whether the defendant's conduct was annoying or indecent—wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 20 (2010). The statutory definitions at issue in this case, by contrast, do "not require similarly untethered, subjective judgments." *Id.*

As relevant here, Congress defined "machinegun" as

> any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person.

§ 5845(b).  A person of ordinary intelligence would understand that this definition covers the PPSh-41 machinegun charged in Counts One and Two.  To the extent Adamiak claims that he lacked notice that § 5845(b) applied because the machinegun was destroyed, the question whether the PPSh-41 could "be readily restored to shoot" automatically was a factual question for the jury to resolve at trial, not a legal ground for the court to dismiss the indictment before trial.  Because the definition of a machinegun is reasonably clear, and the PPSh-41 clearly satisfies that definition, § 5845(b) is not unconstitutionally vague as applied to Adamiak.  *See United States v. Williams*, 364 F.3d 556, 560 (4th Cir. 2004) (holding that § 5845(b) was not unconstitutionally vague as applied to the defendant's possession and transfer of a machinegun receiver).

Similarly, Congress defined "destructive device" as

(1) any explosive, incendiary, or poison gas (A) bomb, (B) grenade, (C) rocket having a propellent charge of more than four ounces, (D) missile having an explosive or incendiary charge of more than one-quarter ounce, (E) mine, or (F) similar device; (2) any type of weapon by whatever name known which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, the barrel or barrels of which have a bore of more than one-half inch in diameter . . . ; and (3) any combination of parts either designed or intended for use in converting any device into a destructive device as defined in subparagraphs (1) and (2) and from which a destructive device may be readily assembled.

§ 5845(f).  A person of ordinary intelligence would understand that this definition covers the M79 grenade launcher, the M203 grenade launcher, and the RPG-7

24

anti-tank missile launchers charged in Counts Three, Four, and Five, respectively. To the extent Adamiak claims that he lacked notice that § 5845(f) applied because the grenade launchers and missile launchers were "inoperable relics," Def. Br. 59, the question whether these devices could "be readily converted to[] expel a projectile by the action of an explosive" was a factual question for the jury to resolve at trial, not a legal ground for the court to dismiss the indictment before trial. Because the definition of a destructive device is reasonably clear, and the grenade launchers and missile launchers clearly satisfy that definition, § 5845(f) is not unconstitutionally vague as applied to Adamiak. *See, e.g.*, *United States v. Emerson*, 432 F. Supp. 2d 128, 135–36 (D. Me. 2006) (holding that § 5845(f) was not unconstitutionally vague as applied to the defendant's possession of a sawed-off shotgun).

Adamiak nonetheless insists that the Court must apply the rule of lenity. The rule of lenity "provides that when ambiguity is present in criminal statutes, that ambiguity must be resolved in favor of lenity for the accused." *United States v. George*, 946 F.3d 643, 645 (4th Cir. 2020). "The simple existence of some statutory ambiguity, however, is not sufficient to warrant application of that rule, for most statutes are ambiguous to some degree." *Muscarello v. United States*, 524 U.S. 125, 138 (1998). Instead, the rule of lenity applies only if there is "a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended." *Barber v. Thomas*, 560 U.S. 474, 488 (2010). Because § 5845

25

"is not ambiguous," the rule of lenity simply "does not apply." *United States v. Helem*, 186 F.3d 449, 455 (4th Cir. 1999).

Finally, the questions whether the PPSh-41 was a "machinegun" and whether the grenade launchers and anti-tank missile launchers were "destructive device[s]" were questions of fact for the jury, not the court, to resolve. *See infra* pp. 35–36. That the court properly submitted those questions to the jury does not render §§ 5845(b) and (f) unconstitutionally vague.

## C. Section 5845 does not violate the Second Amendment as applied to Adamiak.

Adamiak renews his claim that § 5845 violates the Second Amendment as applied to him.[2]  In the district court, he argued that § 5845 does not cover the "nonfunctional items" he possessed.  JA62.  The government maintained that Adamiak's as-applied challenge involved a factual dispute, which the district court could not resolve on a pretrial motion to dismiss.  JA85 (citing *United States v. Weaver*, 659 F.3d 353, 355 n.* (4th Cir. 2011)).  Accordingly, the district court "decline[d] to reach" the as-applied challenge because the parties disputed "whether the offense conduct involved assembled weapons."  JA101.

---

[2] Adamiak also raised a facial challenge in his motion to dismiss.  *See* JA60–61.  He has abandoned that claim on appeal.  *See United States v. Boyd*, 55 F.4th 272, 279 (4th Cir. 2022) ("It is a well settled rule that contentions not raised in the argument section of the opening brief are abandoned.").

The district court properly declined to resolve Adamiak's as-applied challenge before trial. "[T]he government did not proffer or stipulate to the pertinent facts," and "some of the relevant [] facts were developed only at trial." *Engle*, 676 F.3d at 416 n.7. Indeed, Adamiak maintains that the resolution of his Second Amendment claims depends on whether the charged weapons satisfy the definitions in §§ 5845(b) and (f). Def. Br. 63. That was a factual issue for the jury to resolve at trial. *See infra* pp. 35–36. This Court has emphasized that "[f]acts outside of an indictment should not be used to conclusively decide whether an element of a criminal offense is satisfied during a pretrial motion, and a Congressional statute should not be overturned on an incomplete record." *United States v. Hill*, 700 F. App'x 235, 238 (4th Cir. 2017). Therefore, it would have been premature for the district court to conclude, on a motion to dismiss, that § 5845 is unconstitutional as applied to Adamiak. *See id.* at 237.

In any event, Adamiak's claim fails on the merits. The Second Amendment provides that "[a] well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. "[W]hen the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct." *N.Y. State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24 (2022). "The government must then justify its regulation by demonstrating that it is consistent with the

27

Nation's historical tradition of firearm regulation." *Id.* Importantly, "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791." *United States v. Rahimi*, 602 U.S. —, 144 S. Ct. 1889, 1897–98 (2024).

The Court can dispose of this challenge at the threshold because the Second Amendment does not protect Adamiak's possession of an unregistered machinegun, grenade launchers, and anti-tank missile launchers. "Like most rights, . . . the right secured by the Second Amendment is not unlimited." *Rahimi*, 144 S. Ct. at 1897 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008)). "From Blackstone through the 19th-century cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose." *Id.* (quoting *Heller*, 554 U.S. at 626). Accordingly, in *Heller*, the Supreme Court reaffirmed its decision in *United States v. Miller*, 307 U.S. 174, 178 (1939), holding that the prohibition on transporting in interstate commerce an unregistered, short-barreled shotgun did not violate the Second Amendment. The Supreme Court explained that its "basis for saying that the Second Amendment did not apply" in *Miller* was that "the *type of weapon at issue* was not eligible for Second Amendment protection." *Heller*, 554 U.S. at 622. Absent "any evidence tending to show that possession or use" of a short-barreled shotgun had "some reasonable relationship to the preservation or

efficiency of a well regulated militia," the Court could not "say that the Second Amendment guarantees the right to keep and bear such an instrument." *Miller*, 307 U.S. at 178. In *Heller*, the Supreme Court understood *Miller* to hold that "the Second Amendment does not protect those weapons not typically possessed by law-abiding citizens for lawful purposes, such as short-barreled shotguns. That accords with the historical understanding of the scope of the right . . . ." 554 U.S. at 625.

*Bruen* did not abrogate that aspect of *Heller*. In *Bruen*, no "party dispute[d] that handguns are weapons in common use today for self-defense." 597 U.S. at 32. The same is not true for the weapons charged here. This Court previously held, given *Heller*'s recognition that M-16 automatic rifles can be banned, that the Second Amendment does not protect the possession of assault weapons and large-capacity magazines. *Kolbe v. Hogan*, 849 F.3d 114, 136–37 (4th Cir. 2017) (en banc), *abrogated in part by Bruen*, 597 U.S. at 19. Since *Bruen*, at least one court of appeals has reached the same result, reasoning that "*Heller* informs us that [the M-16] is not protected by the Second Amendment, and therefore may be regulated or banned. Because it is indistinguishable from that machinegun, the AR-15 may be treated in the same manner without offending the Second Amendment." *Bevis v. City of Naperville*, 85 F.4th 1175, 1197 (7th Cir. 2023), *cert. denied*, 144 S. Ct. 2491 (2024).

Moreover, the courts that have considered this question after *Bruen* have recognized that the federal prohibitions on the possession of unregistered machineguns are constitutional as applied. *See, e.g.*, *United States v. Fisher*, No. 1:23-cr-45, 2024 WL 589115, at *3 (W.D.N.C. Feb. 13, 2024); *United States v. Lane*, 689 F. Supp. 3d 232, 251–52 (E.D. Va. 2023); *see also, e.g.*, *United States v. Berger*, — F. Supp. 3d —, 2024 WL 449247, at *7–11 (E.D. Pa. Feb. 6, 2024); *United States v. Simien*, 655 F. Supp. 3d 540, 552 (W.D. Tex. 2023). Likewise, courts have consistently upheld regulations of unregistered destructive devices as applied after *Bruen*. *See, e.g.*, *United States v. Teston*, — F. Supp. 3d —, 2024 WL 1621512, at *19–21 (D.N.M. Apr. 15, 2024); *Cox v. United States*, No. CR11-022RJB, 2023 WL 4203261, at *8 (D. Alaska June 27, 2023).

Therefore, Adamiak's possession of the unregistered PPSh-41 machinegun, grenade launchers, and anti-tank missile launchers falls outside the protection of the Second Amendment. Adamiak does not develop any argument as to why §§ 5845(b) and (f), even if constitutional in other situations, are unconstitutional as applied to his conduct. For this alternative reason, the district court properly denied his motion to dismiss.

## II. The district court properly instructed the jury.

The Court "review[s] a district court's decision to give a particular jury instruction for abuse of discretion, and review[s] whether a jury instruction

incorrectly stated the law de novo." *United States v. Miltier*, 882 F.3d 81, 89 (4th Cir. 2018). In "reviewing the propriety of jury instructions," the Court "inquire[s] whether the instructions construed as a whole, and in light of the whole record, adequately informed the jury of the controlling legal principles without misleading or confusing the jury to the prejudice of the objecting party." *United States v. Askew*, 98 F.4th 116, 121 (4th Cir. 2024). "Even if a jury was erroneously instructed, however," the Court "will not set aside a resulting verdict unless the erroneous instruction seriously prejudiced the challenging party's case." *Miltier*, 882 F.3d at 89 (emphasis omitted).

Adamiak asserts that the district court's instructions failed to satisfy *Staples v. United States*, 511 U.S. 600 (1994), because they did not require the jury to find that he knew the machinegun and destructive devices satisfied a particular definition under §§ 5845(b) and (f). Def. Br. 50–53. As an initial matter, Adamiak never challenged the instructions on the knowledge required for Counts One, Three, Four, and Five in the district court. Instead, in proposing other instructions, Adamiak stated that he "agree[d]" that the government's proposed instructions as to the elements of Counts One, Three, Four, and Five and as to the knowledge element were "correct statements of the law, if supported by the evidence at trial." SA60. Further, Adamiak did not object to these instructions during the charge conference, *see* JA779–780, and did not object to the instructions as given, *see* JA827.

Therefore, Adamiak's challenge is reviewable only for plain error. *See, e.g.*, *United States v. Jackson*, 124 F.3d 607, 614 (4th Cir. 1997).

As for Count Two, Adamiak proposed an instruction stating that "the government must prove that the defendant knew that the device he possessed or transferred had *all of the* characteristics that make it subject to regulation as a firearm as I defined that term for you." SA66 (emphasis added). The district court agreed to provide Adamiak's instruction after removing the words "all of the." JA783–784. Adamiak never asked the district court to instruct that the jury must find that he knew the machinegun satisfied a particular definition under § 5845(b). "A party who objects to any portion of the instructions or a failure to give a requested instruction must inform the court of the specific objection and the grounds for the objection before the jury retires to deliberate." Fed. R. Crim. P. 30(d). Therefore, Adamiak's challenge to the instructions on the knowledge required for Count Two is also reviewable only for plain error. On plain-error review, Adamiak "must demonstrate that (1) the asserted defect in the trial was, in fact, error; (2) the error was plain; and (3) the error affected his substantial rights." *Jackson*, 124 F.3d at 614.

Adamiak's claim fails at the first step because the district court's instructions correctly stated the law. In *Staples*, the Supreme Court held that a conviction under § 5861(d) requires proof that the defendant "knew the weapon he possessed had the characteristics that brought it within the statutory definition" of a firearm. *Id.* at 602.

32

This requirement implements "the usual presumption that a defendant must know the facts that make his conduct illegal." *Id.* at 619.

The district court's instructions as a whole satisfied *Staples*. First, the court defined a "firearm" to include a "machinegun" and a "destructive device." JA816. Second, the court instructed the jury on the statutory definitions of "machinegun" and "destructive device." JA816–818. Third, the court required the jury to find, as to Counts One, Three, Four, and Five, that Adamiak "knew that the device he received or possessed had characteristics that make it subject to regulation as a firearm, as I just defined that term for you." JA820. As to Count Two, the court required the jury to find that Adamiak "knew that the weapon he possessed or transferred had characteristics that made it subject to regulation as a machine gun as I have [defined] that term for you." JA823.

Collectively, these instructions ensured that the jury found that Adamiak knew the features of each firearm that brought it within the statutory definition of a "machinegun" or a "destructive device." *See, e.g.*, *United States v. Mink*, 9 F.4th 590, 612 (8th Cir. 2021) ("Because the jury was instructed to find whether [the defendant] knew that the device was a destructive device based on its characteristics, [there was] no error in the instruction."); *United States v. Price*, 877 F.2d 334, 338 (5th Cir. 1989) (holding that the trial court properly instructed the jury because "[t]he instructions, read together, required the jury to first decide whether the grenade

components comprised a 'firearm,'" which "necessarily encompassed a finding" that the components "were 'either designed or intended for use in converting' a device into a destructive device").  That the court's instructions on the knowledge element required the jury to cross-reference the statutory definitions is not error.  *Cf. United States v. Smith*, 44 F.3d 1259, 1270–71 (4th Cir. 1995) ("The district court is not required to give defendant's particular form of instruction, as long as the instruction the court gives fairly covers a theory that the defense offers.").

Moreover, Adamiak has not cited, and the government has not located, any authority of the Supreme Court or this Court requiring the district court to combine these instructions in the manner Adamiak now proposes.  Therefore, any error is not plain.  *See, e.g.*, *United States v. Carthorne*, 726 F.3d 503, 516 (4th Cir. 2013) ("An error is plain if the settled law of the Supreme Court or this circuit establishes that an error has occurred.").

Finally, Adamiak has not met his burden of showing that any plain error affected his substantial rights.  Specifically, he must show that, if the district court "had correctly instructed the jury on the *mens rea* element" of his offenses, "there is a reasonable probability that he would have been acquitted."  *Greer v. United States*, 593 U.S. 503, 508 (2021).  As detailed *infra*, the jury heard substantial evidence that Adamiak had extensive knowledge of firearms, received multiple warnings about possessing unregistered destructive devices, and sold unregistered firearms at a high

price on the black market. He does not claim on appeal that he would have presented evidence at trial that he did not know the PPSh-41 was a machinegun and the grenade launchers and anti-tank missile launchers were destructive devices. *Cf. Greer*, 593 U.S. at 509–10. Because any plain error in the jury instructions did not affect Adamiak's substantial rights, he is not entitled to relief.

## III. Sufficient evidence supports Adamiak's convictions.

Adamiak contends that the district court erred in denying his motion for a judgment of acquittal. This Court reviews "de novo a district court's decision to deny a motion for a judgment of acquittal based on sufficiency of the evidence." *United States v. Smith*, 21 F.4th 122, 139 (4th Cir. 2021). This "review of the evidence following a jury trial is narrow," and the Court must "sustain the verdict if there is substantial evidence, taking the view most favorable to the Government, to support it." *United States v. Seigler*, 990 F.3d 331, 337 (4th Cir. 2021). "Substantial evidence is that which a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." *Smith*, 21 F.4th at 139–40. A defendant "bringing a sufficiency challenge bears a heavy burden, and reversal for insufficient evidence is reserved for the rare case where the prosecution's failure is clear." *Id.* at 140.

As an initial matter, Adamiak maintains that whether a weapon satisfies the statutory definition of a "machinegun" or "destructive device" is a question of law,

which the court impermissibly submitted to the jury.  Def. Br. 20–22.  To the contrary, the district court properly instructed the jury on the legal definitions of "machinegun" under § 5845(b) and "destructive device" under § 5845(f).  Whether the weapons Adamiak possessed satisfied those definitions were questions for the jury to decide.  *See, e.g.*, *United States v. Campo*, 793 F.2d 1251, 1252 (11th Cir. 1986) (per curiam); *Hoover*, 635 F. Supp. 3d at 1320; *United States v. Was*, 684 F. Supp. 350, 354 (D. Conn. 1988); *cf. United States v. Johnson*, 718 F.2d 1317, 1321 n.13 (5th Cir. 1983) (en banc) ("It is the judge's duty to instruct the jury concerning [the] definition [of a security]: the way in which a security is identified. Whether a particular piece of paper meets that definition, however, is for the jury to decide.").

Counts One, Three, Four, and Five required the government to prove that (1) Adamiak "consciously possessed what he knew to be a firearm"; (2) he "was aware of the . . . features that brought his gun within the realm of regulation"; and (3) "the firearm was unregistered." *United States v. Jamison*, 635 F.3d 962, 967–68 (7th Cir. 2011).  Count Two required the government to prove that Adamiak (1) "knowingly possessed a machine gun"; and (2) "knew or was aware of the essential characteristics of the firearm which made it a machine gun." *United States v. De La Paz-Rentas*, 613 F.3d 18, 29 (1st Cir. 2010).  In this context, "knowledge

36

can be inferred from circumstantial evidence, including any external indications signaling the nature of the weapon." *Staples*, 511 U.S. at 615 n.11.

Adamiak does not dispute that he possessed the charged firearms and that they were unregistered. Instead, he challenges the evidence that the PPSh-41 was a machinegun and that he knew of the characteristics that made it a machinegun. Likewise, he challenges the evidence that the M79 grenade launcher, the M203 grenade launcher, and the RPG-7 anti tank missile launchers were destructive devices and that he knew of the characteristics that made them destructive devices. Because substantial evidence supports Adamiak's convictions, the Court should affirm.

### A.  Sufficient evidence supports Adamiak's convictions for possession of an unregistered machinegun.

Substantial evidence supports Adamiak's convictions on Counts One and Two. First, Adamiak asserts that the PPSh-41 is not a "machinegun" because it is not a "weapon." Def. Br. 28–29. In his Rule 29 motion, however, he challenged only the sufficiency of the evidence that he knew that the PPSh-41 had the characteristics of a "machinegun" and the evidence that it could be "readily restored to shoot" automatically. JA762–763, JA766–767. Therefore, this claim is reviewable only for plain error. *See United States v. Duroseau*, 26 F.4th 674, 678 & n.2 (4th Cir. 2022) (explaining that the Court will review for plain error grounds not specifically raised in a Rule 29 motion).

In any event, the jury heard substantial evidence that the PPSh-41 is a "machinegun" because it is a "weapon" which "is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." § 5845(b). Officer Davis testified that the PPSh-41 is "an iconic Russian weapon of World War II," designed to defend "against advancing German troops." JA588. Agent Hairston and Pruess described the item purchased during the fourth controlled buy as a "complete" PPSh-41 machinegun. JA389, JA520. It was "ready to put back together, no other parts [] required." JA521. Once reassembled, the firearm would shoot "900 rounds per minute." JA521. Officer Davis examined the PPSh-41 and testified that, if he had reassembled the PPSh-41 and test-fired it, it would have fired as a machinegun. JA590.

Further, the jury heard ample evidence that the PPSh-41 could "be readily restored to shoot" automatically. Pruess described the PPSh-41 as having "[a] single saw cut," which "render[ed] the gun unserviceable to a degree, but not unserviceable so as not to be able to be put back together." JA508–509. Pruess estimated that it would take "[a] minute of welding" to reassemble the pieces so that it would fire. JA509. It would take only 30 more minutes to "polish[] it and refinish[] it so you would never tell it was ever even cut." JA522. Likewise, Officer Davis opined that the firearm "would be considered readily restorable" because "[i]t wouldn't take a

great deal to bring that firearm back to firing condition." JA583. He reiterated that "saw-cut receivers, especially only having one saw cut in a non-critical area, are quite easy to bring back into serviceable condition." JA609.

Thus, the PPSh-41 is a "machinegun" because it "is designed to shoot, or can be readily restored to shoot, automatically." *See, e.g.*, *United States v. One TRW, Model M14, 7.62 Caliber Rifle*, 441 F.3d 416, 422–23 (6th Cir. 2006) (holding that a firearm which would require "a maximum of six hours to convert to fire automatically, 'can be readily restored' under the NFA"); *United States v. Pena-Lora*, 225 F.3d 17, 31 (1st Cir. 2000) (holding that an UZI that "had been damaged and/or clogged at some time in the past, and could not be fired until repaired," qualified as a "machinegun"); *United States v. Smith*, 477 F.2d 399, 400–01 (8th Cir. 1973) (substantial evidence established that the submachinegun could be readily restored to shoot automatically based on ATF officer's testimony that it could be made to function in "an 8-hour working day in a properly equipped machine shop"); *see also United States v. Willis*, 992 F.2d 489, 491 n.2 (4th Cir. 1993) (rejecting the argument that an inoperable firearm is not a "firearm" under 18 U.S.C. § 921(a)(3)).

Adamiak claims that the government improperly relied on ATF rulings to establish that the firearms were not destroyed. Def. Br. 22–27; Letter under Fed. R. App. P. 28(j) (July 10, 2024). But the question for the jury to resolve was whether

the PPSh-41 could be "readily restored to shoot[] automatically," § 5845(b), not whether it was "destroyed." Congress, not ATF, codified the definition of a machinegun in § 5845(b). "Because the definition at issue here was not based on a regulation promulgated by a government agency, authority addressing an agency's promulgation of rules is not relevant to" the sufficiency of the evidence supporting Adamiak's convictions. *Hoover*, 635 F. Supp. 3d at 1321; *see United States v. Kuzma*, 967 F.3d 959, 971 (9th Cir. 2020) (rejecting vagueness challenge to § 5845(b) based on "inconsistency in ATF's position on the classification of a particular device" because "the text of the applicable prohibitions and definitions is set forth in *statutory* language").

Additionally, the jury heard substantial evidence regarding Adamiak's knowledge of the characteristics of the PPSh-41 that brought it within the definition of a machinegun. Pruess testified that Adamiak "was selling" unregistered PPSh-41 and PPSh-43 machineguns "openly" on gunbroker.com. JA505. The jury saw the PPSh-41 Adamiak sold to Pruess and how it would look if reassembled. *See* JA2305–2307. A reasonable factfinder could infer that a person who was selling these weapons knew of their characteristics. *Cf. United States v. Gonzales*, 121 F.3d 928, 937 (5th Cir. 1997) ("It defies credibility to suggest that the owner of a machinegun . . . did not realize that the rifle was an automatic weapon."), *overruled on other grounds by United States v. O'Brien*, 560 U.S. 218 (2010).

Further, the jury could infer that Adamiak knew the characteristics of the PPSh-41 because he charged a high price for it in an unregulated market. Adamiak sold machineguns on gunbroker.com, the equivalent of eBay for guns. JA500. When he sold Pruess the PPSh-41, Adamiak did not ask whether Pruess had a federal firearms license or a special occupational tax and did not ask Pruess to complete a background check. *See* JA509–510. Pruess explained that the PPSh-41 "would normally be cut, all the pieces, with a torch, not a simple hacksaw, to render it to where it's . . . a great deal of work to put back together," and it would be "worthless." JA510. By contrast, the PPSh-41 "demanded a lot more money because it was so easy to put back together with a minimal amount of effort." JA510.

The jury also heard testimony from Schramm, the manager of a firearms retailer, that invoices sent to his store "had been changed from DOA Arms, LLC, 977 Rion Drive to Black Dog Tactical," Adamiak's company. JA696. Schramm had "quite a few orders that came in like that," and the out-of-state retailer could not explain the error. JA696. When Schramm asked Adamiak about the invoices, Adamiak claimed it was "a mistake," JA697, but Schramm did not believe him, JA700–701. ATF also found in Adamiak's house a letter from Slovenia, which encouraged Adamiak to use "a burner phone" for "our little conversation." JA2335. A jury could reasonably infer, based on evidence that Adamiak was conducting

41

covert transactions, that he knew the characteristics of the PPSh-41 that brought it within the definition of a machinegun.

Further, there was substantial evidence of Adamiak's extensive knowledge of firearms. In Adamiak's house, agents found "operating and maintenance manuals" for "semiautomatic and [] submachine gun versions" of MAC firearms, "[b]lueprints for the MAC receivers," "MAC firearm parts diagrams and a parts list," and a diagram for a military machinegun. JA657–658.

The jury heard that Adamiak served as a master-at-arms in the United States Navy, which is "the Navy's security specialist." JA712. Master Chief Alek-Finkelman observed that Adamiak had "a high level of weapons training." JA717. Adamiak had multiple weapons qualifications specific to machineguns, JA2376; multiple certifications involving machineguns, JA2382; and multiple licenses specific to machineguns, JA2383–2384. He also had completed multiple firearms trainings, including operator trainings for multiple types of machineguns. *See* JA2390, JA2396.

Likewise, based on their transactions over the course of about a year, JA498, Pruess observed that Adamiak was "[v]ery knowledgeable" about firearms, JA500. "[W]henever" Pruess offered Adamiak "a part[,] he would seem to be pretty well familiar with it and what it was worth and so forth." JA500. Similarly, Schramm

42

observed that Adamiak was knowledgeable about firearms based on their interactions over six years.  JA692–693.

Based on Adamiak's extensive knowledge of firearms, his selling unregistered firearms on the black market, and his handling of the PPSh-41, a reasonable jury could find that he knew the characteristics of the firearm that made it a machinegun.  *See, e.g.*, *United States v. Pérez-Greaux*, 83 F.4th 1, 27 (1st Cir. 2023) ("Because [the defendant] 'handled' the firearm and was familiar with firearms—inferred from his possession of firearm periodicals—a reasonable jury could have thus concluded that he knew it had been altered to fire automatically."); *United States v. Shaw*, 670 F.3d 360, 365 (1st Cir. 2012) (concluding that the jury could infer that the defendant "was familiar with firearms, more so than an average layman, and thus able to meaningfully distinguish between the physical characteristics and capabilities of different guns").

Finally, Adamiak claims that his convictions and consecutive sentences on Counts One and Two violate the Double Jeopardy Clause because possession of a machinegun under § 922(o) is a lesser-included offense of possession of an unregistered machinegun under § 5861(d).  Def. Br. 36–37.  Because Adamiak never raised this claim in the district court, it is reviewable only for plain error. Nonetheless, the government concedes that Adamiak has established a plain error that affects his substantial rights.  Specifically, "§ 922(o) does not require proof of

any element that is not also required under § 5861(d)," such that "[t]he § 922(o) charge is [] a lesser-included offense of the § 5861(d) charge." *Kuzma*, 967 F.3d at 977; *see also United States v. Mann*, 701 F.3d 274, 286–87 (8th Cir. 2012). Further, "neither statute (nor any other provision of law) indicates that Congress authorized cumulative punishments to be imposed simultaneously under both provisions." *Kuzma*, 967 F.3d at 977. Therefore, the government respectfully requests that the Court remand to the district court with instructions to vacate Adamiak's conviction and sentence on either Count One or Count Two. *See, e.g.*, *United States v. Tipton*, 90 F.3d 861, 891 (4th Cir. 1996).

### B.  Sufficient evidence supports Adamiak's convictions for possession of unregistered destructive devices.

Substantial evidence also supports Adamiak's convictions on Counts Three, Four, and Five. Adamiak initially asserts that the M79 grenade launcher, M203 grenade launcher, and RPG-7 anti-tank missile launchers are not "destructive devices" because they are not "weapons." Def. Br. 39–41. Because Adamiak never raised this specific ground for acquittal in his Rule 29 motion, *see* JA764–766, it is reviewable only for plain error. *See Duroseau*, 26 F.4th at 678 & n.2. And contrary to Adamiak's claim, the jury heard substantial evidence that the grenade launchers and anti-tank missile launchers were "destructive device[s]," because they were "weapon[s] . . . which will, or which may be readily converted to, expel a projectile by the action of an explosive or other propellant, the barrel or barrels of which have

44

a bore of more than one-half inch in diameter." § 5845(f). Alternatively, the M203 grenade launcher also qualified as "any combination of parts either designed or intended for use in converting any device into a destructive device . . . and from which a destructive device may be readily assembled." *Id.*

At trial, the jury saw the M79 grenade launcher, JA2308, the M203 grenade launcher, JA2309, and the RPG-7 anti tank missile launchers, JA2315–2316.

Agent Hairston testified that the M79 grenade launcher "operates kind of like a break-action shotgun: You would just connect the barrel to the receiver and you have a complete, full M79 40mm grenade launcher." JA395. Similarly, Pruess testified that an M79 grenade launcher is "a high-explosive grenade launcher, so it shoots a grenade 400 yards." JA524. Officer Bodell determined that the firearm was manufactured "under contracts with the Department of the Army." JA2467. Further, Bodell examined the M79 grenade launcher and determined that it had a bore diameter of about 1.62 inches. JA2467. He performed three test-fires, and each time, the M79 grenade launcher "successfully expelled a projectile by the action of an explosive." JA2467.

As for the M203 grenade launcher, Pruess testified that it "is what the military uses currently" because it "can be attached to [the] bottom of an M-16 rifle," so that a person only had "to carry one weapon instead of two." JA525. He explained that the M203 can shoot like a gun by inserting "the 40mm grenade inside the barrel,

clos[ing] the breach[,] and pull[ing] the trigger." JA525.  Bodell examined the M203 grenade launcher and determined that it had a bore diameter of about 1.62 inches. JA2468.  He test-fired the M203 grenade launcher, and it "successfully expelled a projectile by action of an explosive."  JA2468.

Regarding the anti-tank missile launchers, Pruess testified that the RPG-7 is a "rocket-propelled grenade launcher," which "shoots a rocket out to 920 meters." JA526.  Bodell explained that "[t]he RPG-7 is reloadable and can fire a variety of rocket-propelled grenades, with warheads for anti-armor or anti-personnel purposes."  JA2469.  The RPG-7 is "designed to take out tanks[ and] armored personnel carriers."  JA526.  To operate the device, "you insert [ammunition] in the front," "pull the hammer down," "press the trigger," and "it propels the grenade." JA526.

Bodell examined the RPG-7 anti tank missile launchers and determined that both devices had bore diameters greater than one-half an inch.  JA2470, JA2472. The RPG-7s were missing five components, which "are commercially available." JA2470, JA2471.  Although each RPG-7 had "a small hole, approximately 0.39 inch in diameter," Bodell opined that "[t]his small hole will not prevent the weapon from functioning and may readily be repaired."  JA2470, JA2471.  After installing three components, Bodell test-fired the RPG-7s using "an RPG training device."  JA638.

46

He performed three test fires of each device, and each time, the RPG-7 "successfully expelled a projectile by the action of an explosive." JA2470, JA2472.

Contrary to Adamiak's claim, Def. Br. 42–43, evidence that he stored the M79 and M203 barrels separately from the receivers does not remove the devices from § 5845(f)'s ambit. Agent Hairston testified that Adamiak could "very easily" have opened the safe, removed the M79 receiver, and "connect[ed] that barrel in less than 10 minutes." JA490. Indeed, Officer Bodell "assembled the weapon by simply hooking the barrel assembly to the receiver assembly and attaching the forend." JA2467. Likewise, Officer Bodell "assembled" the M203 grenade launcher "by simply sliding the barrel assembly onto the receiver assembly." JA2468. Thus, a reasonable factfinder could conclude that the M79 and M203 grenade launchers could be "readily converted to[] expel a projectile by the action of an explosive." *See, e.g.*, *United States v. Kent*, 175 F.3d 870, 874 (11th Cir. 1999) ("Because the short-barreled upper receiver unit and the Colt AR-15 lower receiver unit were located in the same, small apartment and could be connected so quickly and easily, creating an operable short-barreled rifle with only a minimum of effort, evidence that [the defendant] possessed both of these units was sufficient to prove that" he possessed a "firearm" under § 5845.); *United States v. Woods*, 560 F.2d 660, 664 (5th Cir. 1977) ("The fact that the weapon was in two pieces when found is

47

immaterial considering that only a minimum of effort was required to make it operable.").

Substantial evidence also established that Adamiak knew of the characteristics of the grenade launchers and anti-tank missile launchers that brought them within the definition of a destructive device. Indeed, the jury heard that Adamiak was repeatedly warned about possessing a combination of parts that would constitute a destructive device. In July 2021, Pruess visited Adamiak's house and observed a Mark 19 grenade launcher in the garage. JA500, JA502. Pruess asked Adamiak "if he had a license to possess those and he said he was planning on getting one, but he didn't really seem very urgent to get one." JA502. Pruess warned Adamiak that "if he did any work to it or tried to assemble it, it would be a destructive device." JA502.

On a different occasion, Adamiak sent Pruess an email asking if an M79 grenade launcher "would be a good value to buy." JA523. Pruess told Adamiak, "not if it's got the barrel, because it's going to be a destructive device." JA523. Pruess told Adamiak that he could not possess both the barrel and the receiver "because that would constitute constructive possession of the grenade launcher." JA523. Adamiak responded that he would just "put one in another house," but Pruess warned him that would still be "constructive possession" because Adamiak controlled the other house. JA524–525. Similarly, when Adamiak picked up the M79 receiver from Schramm's store, they discussed "what it was used for," and

48

Schramm explained that he "had to check to make sure it wasn't already registered and being transferred improperly." JA694.

As detailed *supra*, the jury heard substantial circumstantial evidence about Adamiak's business selling unregistered firearms online and his extensive knowledge of firearms. In addition to the Naval weapons trainings described above, Adamiak also had qualifications specific to grenades, including certifications in operating M203 grenade launchers, JA2382, and multiple qualifications for M203 grenade launchers, JA2383. Viewed in the light most favorable to the government, substantial evidence supported the jury's conclusion that Adamiak knew the characteristics of the grenade launchers and anti-tank missile launchers that made them destructive devices. *Cf. United States v. Rohwedder*, 243 F.3d 423, 426 (8th Cir. 2001) (holding that the district court did not clearly err in finding that the defendant knew the characteristics of the sawed-off shotgun given his "experience with weapons").

## IV. The district court's sentence of 240 months' imprisonment is procedurally reasonable.

Adamiak raises two challenges to the district court's application of the Sentencing Guidelines. "In determining whether a district court properly applied the advisory Guidelines, including application of any sentencing enhancements," this Court "review[s] the district court's legal conclusions *de novo* and its factual findings for clear error." *United States v. McKenzie-Gude*, 671 F.3d 452, 462–63

49

(4th Cir. 2011).  The Court "will not reverse a lower court's findings of fact simply because [this Court] would have decided the case differently."  *United States v. Medley*, 34 F.4th 326, 337 (4th Cir. 2022).  "Instead, clear error occurs when the lower court's factual findings are against the clear weight of the evidence considered as a whole."  *Id.*

### A. The district court did not clearly err in finding 33 firearms attributable to Adamiak.

First, Adamiak challenges the application of a six-level enhancement under U.S.S.G. § 2K2.1(b)(1)(C) for an offense involving 25–99 firearms.  Initially, the PSR determined that there were 982 firearms involved in the offense and recommended a ten-level enhancement under § 2K2.1(b)(1)(E) for an offense involving 200 or more firearms.  JA2520.  Adamiak successfully objected to the inclusion of 977 MAC flats, which the district court determined did not qualify as "firearms" under § 2K2.1.  *See* JA2261–2264.  Simultaneously, the court sustained the government's objection to the PSR's failure to include the seven machinegun receivers he transferred during the controlled buys, the four destructive devices

recovered from his house, and 23 uncharged items[3] found in his house. *See* JA2241–2242. Accordingly, the district court found that a total of 33 firearms were attributable to Adamiak. *See* JA2568.

Adamiak contests only the district court's reliance on the report prepared by Officer Bodell classifying 23 uncharged items found in Adamiak's house as firearms. *See* JA1831–1852. Adamiak asserts, without elaborating, that the district court's finding was clearly erroneous because it was based on "the legal conclusions offered by ATF in its report." Def. Br. 57. Adamiak waived this argument by failing to develop it in his opening brief. *See Taylor-Sanders*, 88 F.4th at 525 n.5. In any event, his argument lacks merit.

Although Officer Bodell did not testify at sentencing, he testified at length as an expert in firearms classification and identification at trial. The district court heard Officer Bodell describe his examination of 32 items recovered from Adamiak's house, including the uncharged items attributed to Adamiak as firearms at sentencing. *See* JA639–659. The district judge reviewed her trial notes in preparation for Adamiak's sentencing. JA2032. In the report he prepared before

---

[3] The final PSR's attribution of 33 firearms appears to rely on a total of 22 firearms listed in Officer Bodell's report. As the district court noted, Officer Bodell determined that 23 items, not 22 items, recovered from the house were firearms. JA2242 n.2. Because the district court found that eleven other firearms were attributable to Adamiak, the difference is immaterial to the applicability of the enhancement for an offense involving a total of 25–99 firearms.

sentencing, Officer Bodell offered his opinion, based on his examination of the uncharged items, that they qualified as firearms. The district court found by a preponderance of the evidence that Bodell's report was "sufficient." JA2242. The court's reliance on that report was not clearly erroneous. *See, e.g.*, *United States v. Washington*, 146 F.3d 219, 222 (4th Cir. 1998) (holding that the district court's determination that "the amended lab report was reliable" was "not clearly erroneous").

## B. The district court properly applied the fifteen-level destructive device enhancement.

Second, Adamiak challenges the application of a fifteen-level enhancement under U.S.S.G. § 2K2.1(b)(3)(A) for an offense involving a "destructive device that is a portable rocket, a missile, or a device for use in launching a portable rocket or missile." The Guideline defines "destructive device" as provided in § 5845(f). *See* § 2K2.1 cmt. n.1. In overruling Adamiak's objection, the district court reasoned that RPG-7s "are shoulder-fired missile weapons that launch rockets equipped with explosive warhead[s]." JA2257. The court cited Officer Bodell's trial testimony "that he was able to fire the RPG-7 variant with an RPG-7 training device." JA2257. Accordingly, the court concluded that the RPG-7 anti-tank missile launchers charged in Count Five "plainly" satisfied § 2K2.1(b)(3)(A). JA2257. That finding was not clearly erroneous. *See, e.g.*, *United States v. Teeter*, 561 F.3d 768, 771 (8th Cir. 2009).

52

Adamiak renews his claim, based on *United States v. Blackburn*, 940 F.2d 107 (4th Cir. 1991), that § 2K2.1(b)(3)(A) does not apply because the RPG-7s were not "complete and dangerous." Def. Br. 55 (emphasis omitted). In *Blackburn*, the Court held that § 5845(f)(3), which defines a "destructive device" as "any combination of parts either designed or intended for use in converting any device into a destructive device . . . and from which a destructive device may be readily assembled," "does not take on a broader meaning when it is applied to the sentencing phase of a criminal proceeding." *Blackburn*, 940 F.2d at 110. Accordingly, for the enhancement to apply based on § 5845(f)(3), "[a] defendant must possess every essential part necessary to construct a device." *Id.* (emphasis omitted). In this case, however, Officer Bodell opined that the RPG-7s were destructive devices under § 5845(f)(1) because they were weapons which "may be readily converted to[] expel a projectile by the action of an explosive or other propellant, the barrel or barrels of which have a bore of more than one-half inch in diameter." JA2470–2472. Because § 5845(f)(3) is not at issue here, the district court correctly concluded that *Blackburn* is inapposite. *See* JA2259.

Adamiak nevertheless maintains that the district court improperly applied the enhancement because the indictment and the jury instructions did not specify that the RPG-7s satisfied the definition in § 5845(f)(1). As explained *supra*, the indictment sufficiently alleged the elements of the offenses charged, and the court

properly instructed the jury on the definition of a destructive device. Further, "[s]entencing judges may find facts relevant to determining a Guidelines range by a preponderance of the evidence, so long as the Guidelines sentence is treated as advisory and falls within the statutory maximum authorized by the jury's verdict." *United States v. Benkahla*, 530 F.3d 300, 312 (4th Cir. 2008). That practice "does not violate the Sixth Amendment" because "the judge could disregard the Guidelines and apply the same sentence . . . in the absence of the special facts." *Id.* In this case, there was no Sixth Amendment violation because the district court clearly treated the 600-month Guideline range as advisory when it varied down to 240 months.

### C.   Any error in the district court's calculation of the Guidelines range was harmless.

Finally, even if the Court determines that the district court erred in attributing 33 firearms to Adamiak, applying the fifteen-level destructive device enhancement, or both, any error was harmless. "[P]rocedural errors at sentencing . . . are routinely subject to harmlessness review." *United States v. Hargrove*, 701 F.3d 156, 161 (4th Cir. 2012). A Guidelines error is harmless if the Court determines that "(1) the district court would have reached the same result even if it had decided the guidelines issue the other way, and (2) the sentence would be reasonable even if the guidelines issue had been decided in the defendant's favor." *United States v. Gomez-Jimenez*, 750 F.3d 370, 382 (4th Cir. 2014). Because Adamiak's sentence satisfies both requirements, any error here was harmless.

First, the district court expressly stated that it would have imposed the same sentence "regardless of the outcome of the objections."  JA2265; *see* JA2588. Applying the six-level enhancement under § 2K2.1(b)(1)(C) and the fifteen-level enhancement under § 2K2.1(b)(3)(A), the total offense level was 43 and the advisory Guidelines range was restricted at 600 months.  *See* JA2574.  Adamiak requested a sentence of 60 months, JA2040, and the government requested a sentence of 360 months, JA2180.  Ultimately, the district court sentenced Adamiak to 240 months' imprisonment.  JA2227.

If the district court  had applied only a four-level enhancement under § 2K2.1(b)(1)(B) for an offense involving 8–24 firearms and a two-level enhancement under § 2K2.1(b)(3)(B) for an offense involving a destructive device that is not "a portable rocket, a missile, or a device for use in launching a portable rocket or missile," the total offense level would drop to 28.  The corresponding advisory Guidelines range would be 78 to 97 months' imprisonment. *See* U.S.S.G. ch. 5 pt. A.  Nevertheless, the district court concluded that Adamiak's "conduct would have warranted upward variances had the enhancements not been applied." JA2266; *see* JA2588.   The court explained that "[t]he serious nature of [his] convictions and conduct require a sentence of at least 20 years' imprisonment." JA2235 n.1.  Accordingly, "[t]he sentence imposed reflects the seriousness of [his]

offenses and would have remained the same regardless of the outcome of his objections." JA2266.

Second, even if the court had resolved the objections in Adamiak's favor, his sentence would be substantively reasonable. To determine whether a sentence is substantively reasonable, this Court "examine[s] the totality of the circumstances to see whether the sentencing court abused its discretion in concluding that the sentence it chose satisfied the standards set forth in [18 U.S.C.] § 3553(a)." *Gomez-Jimenez*, 750 F.3d at 383. The district court's thorough, individualized assessment establishes that it did not abuse its discretion when it determined that a 240-month sentence was sufficient, but not greater than necessary, to satisfy the purposes of § 3553(a).

The court considered as mitigating factors Adamiak's academic achievement, military service, volunteer work, good conduct while on bond pending trial, and the letters submitted by his family, friends, neighbors, and coworkers. JA2221–2223. Nonetheless, the court emphasized "the overall picture in this case, which is that [Adamiak] ran a firearms parts business engaged in high volume sales, purchases, and trades without regard for the law." JA2266. The court rejected his "claims of ignorance," reasoning that he "received multiple warnings about the lawfulness of his actions," which he "ignored." JA2587. Further, the court found that Adamiak's conduct while awaiting sentencing was "very aggravating." JA2217. The court observed that, as a result of the disclosures on Facebook and YouTube, "the Master

56

Chief and [Pruess] expressed fears for their families' safety, and [Pruess] lost many customers and received death threats." JA2588. Based on the totality of the circumstances, even if the district court had sustained Adamiak's objections, its 240-month sentence would satisfy the § 3553(a) factors.

## V. The record does not conclusively establish that Adamiak's trial counsel rendered ineffective assistance.

Adamiak claims that his trial counsel rendered constitutionally ineffective assistance by failing to timely notice a firearms expert and by failing to object to opinion testimony offered by the government's experts. Def. Br. 60–61. "Claims of ineffective assistance of counsel may be raised on direct appeal only where the record conclusively establishes ineffective assistance." *United States v. Baptiste*, 596 F.3d 214, 216 n.1 (4th Cir. 2010). To demonstrate ineffective assistance of counsel, Adamiak "must show that (1) his counsel's performance was deficient, and (2) his counsel's deficient performance prejudiced him." *United States v. Slocum*, 106 F.4th 308, 312 (4th Cir. 2024).

Although Adamiak focuses on trial counsel's failure to timely file the expert notice, the district court did not penalize Adamiak for the late notice. *See* JA356 n.1 (district court observing that the notice was untimely but declining to address the issue because neither party had raised it). Indeed, the district court denied the government's motion in limine to exclude the testimony of Daniel O'Kelly, reserving for trial the question whether he was qualified to testify as a rebuttal

witness.  *See* JA357–358.  To the extent Adamiak's actual issue is with his counsel's decision not to call O'Kelly to testify at trial, *see* JA774, the record does not conclusively establish that counsel had no strategic reason for that decision.

Further, "existing precedent" does not "strongly suggest" that trial counsel should have objected to the government experts' testimony regarding the classification of the charged machinegun and destructive devices.  *United States v. Morris*, 917 F.3d 818, 824 (4th Cir. 2019); *see, e.g.*, *United States v. Bishop*, 926 F.3d 621, 632–33 (10th Cir. 2019) (holding that the district court did not abuse its discretion in allowing government expert to testify that the firearm satisfied the statutory definition of a machinegun); *see also United States v. Buchanan*, 787 F.2d 477, 483 & n.7 (10th Cir. 1986) (collecting cases admitting such testimony).  Thus, the record does not conclusive establish that trial counsel's performance was deficient, let alone that it prejudiced Adamiak.

## Conclusion

The Court should remand with instructions to vacate Adamiak's conviction and sentence on either Count One or Count Two. In all other respects, the Court should affirm the judgment of the district court.

Respectfully submitted,

Jessica D. Aber
United States Attorney


_____ /s/

Jacqueline R. Bechara
Assistant United States Attorney

## Statement Regarding Oral Argument

The United States respectfully suggests that oral argument is not necessary in this case.  The legal issues are not novel, and oral argument likely would not aid the Court in reaching its decision.

## Certificate of Compliance

I certify that this brief was written using 14-point Times New Roman typeface and Microsoft Word 2016.

I further certify that this brief does not exceed 13,000 words (and is specifically 12,990 words) as counted by Microsoft Word, excluding the table of contents, table of authorities, statement regarding oral argument, this certificate, the certificate of service, and any addendum.

I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.

/s/
_____
Jacqueline R. Bechara
Assistant United States Attorney

60