UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

No. 23-4451

PATRICK TATE ADAMIAK,

Defendant-Appellant.

_____

## APPELLANT PATRICK TATE ADAMIAK'S PETITION FOR PANEL REHEARING AND REHEARING *EN BANC*

This case saw the government, for the first time, interpret the National Firearms Act to apply to a series of inert articles that the ATF has for decades permitted the unrestricted commercial sale, resulting in Appellant's 20-year sentence, which the panel affirmed *per curiam*. On this, Appellant Patrick Tate Adamiak respectfully petitions for panel rehearing and rehearing *en banc* under Fed. R. App. P. 40 and 35 and Fourth Circuit Local Rule 40, because the panel opinion overlooks and misapprehends material facts and controlling law, and because the questions presented are of exceptional importance.

1

# TABLE OF CONTENTS

**I. STATEMENT UNDER RULE 40** ......................................................... 3

**II. THE PANEL MISAPPREHENDED THE RECORD AND CONTROLLING LAW ON THE STATUS OF THE CHARGED ITEMS AS §5845 "FIREARMS"** ......................................................... 4

    A.    The undisputed evidence shows no reasonable jury, properly instructed, could have returned a conviction as to any of the alleged "firearms." ......................................................... 4

        1.    The alleged PPSH "machinegun" (Counts 1 and 2) ............ 7

        2.    RPG Launchers (Count 5) ...................................................... 9

        3.    M79 and M203 Receivers (Counts 3 and 4) ......................... 12

    B. The Indictment Was Indeed Defective. ................................... 14

    C. The panel's affirmance conflicts with controlling Supreme Court and Circuit precedent. ......................................................... 15

    D. The error is outcome-determinative. ........................................ 15

**III. THE PANEL SHORT-CIRCUITED THE PRESERVED SECOND AMENDMENT CLAIM** ....................................................... 16

**IV. SENTENCING** ................................................................................ 18

**Certificate of Service** ............................................................................. 20

**Certificate of Compliance** ..................................................................... 20

## I. STATEMENT UNDER RULE 40

This petition is based on three independent and dispositive grounds:

1. The panel overlooked or misapprehended the undisputed record evidence that all items underlying Appellant's convictions were non-functional relics requiring material alteration and fabrication, not mere assembly, to become NFA-subject weapons. This renders the evidence legally insufficient under 26 U.S.C. § 5845(b) and (f) as interpreted by *United States v. Thompson/Center Arms Co.*, 504 U.S. 505 (1992), *Cargill v. Garland*, 602 U.S. 240 (2024), and *Staples v. United States*, 511 U.S. 600 (1994).

2. The panel misapprehended and failed to address Appellant's preserved Second Amendment challenge, short-circuiting the *Bruen* test and treating the challenged conduct as categorically valid without conducting the required inquiry. See *New York State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022).

3. The panel insisted that a bill of particulars would have cured the notice issues in the indictment, but "it is a settled rule that a bill of particulars cannot save an invalid indictment." *Russel v. U.S.* 369 U.S. 749 (1962).

These issues are exceptionally important because the government is applying the statutes here at issue to items the government has—for decades—explicitly permitted the unrestricted commercial sale. (Pet. Br. at 24-25). There has been no intervening change in law, and in fact the very same items Appellant was charged with are still routinely and openly commercially sold. The government's *post hoc* re-interpretations of §5845 threatens to criminalize collectors and dealers for possessing

3

inert historical artifacts that are both beyond the scope of the charged statutes and clearly entitled to constitutional protection.

## II. THE PANEL MISAPPREHENDED THE RECORD AND CONTROLLING LAW ON THE STATUS OF THE CHARGED ITEMS AS §5845 "FIREARMS"

### A. The undisputed evidence shows no reasonable jury, properly instructed, could have returned a conviction as to any of the alleged "firearms."

The record admits only one conclusion: no reasonable jury, properly instructed on the governing statutory definitions, could have returned a guilty verdict as to any of the alleged "firearms." The government's theory cannot plausibly have been grounded in any prong of 26 U.S.C. § 5845(b) and (f), and the court instructed on the entire text of those provisions without ever identifying which applied. The critical factual context—that these were destroyed relics—appears to have been lost on the Panel, particularly as the panel at oral argument suggested Appellant "pretended to disassemble" the items. The actual record could not be further from this. The items were indisputably inert as possessed.

The panel gave this little shrift, but the defect undermines the conviction as to sufficiency of both the evidence and the instructions. With respect to § 5845(f), for example, the jury heard the complete

4

definition of "destructive device," which includes "any explosive, incendiary, or poison gas bomb, grenade, rocket, missile, mine, or similar device," and "any combination of parts" from which such a device may be readily assembled. 26 U.S.C. § 5845(f)(1)–(3). Likewise, § 5845(b) defines "machinegun" in the disjunctive.

The government presented no evidence tying any charged item to a specific definitional pathway. Instead, it invited conviction on the sweeping premise that inert relics and display pieces were either now or could eventually be fabricated into NFA-regulated weapons. The court's unrestricted instructions allowed jurors to convict even under inapplicable subparagraphs—potentially including § 5845(f)(1)'s "poison gas" clause—without any evidentiary basis or limiting instruction. Such breadth deprived the jury of the ability to decide guilt under a rational legal standard.

The panel, at oral argument, overlooked this by asserting a bill of particulars to be the correct path, but a bill of particulars would not remedy an invitation for the jury to reverse-engineer a conviction. A conviction we, looking at the complete record, can glean nothing of the

5

verdict's legal basis.[1] Each of the different definitions of "machinegun" and "destructive device" "is itself technical and requires precision." *U.S. v. Huff*, 512 F.2d 66, 68-69 (5th Cir. 1975). Where we have no idea what he was convicted of, there is no way Appellant had the notice required by the Fifth Amendment.

A properly instructed jury would have been told that each statutory clause requires proof beyond a reasonable doubt that the object, as possessed, satisfied the elements of the specific definition charged.

None of the items here—cut-up parts, drilled-out training aids, or lawfully held launcher receivers—met any operative § 5845 definition. The government's case depended entirely on post-seizure alterations and machinations of the ATF.

Quite simply, something is or is not an NFA firearm, "[W]hat Congress meant by the term [destructive device] was an association of the components of a destructive device, **at the same time and place**, capable of being converted into a destructive device." *U.S. v. Blackburn*,

---

[1] As indicted, charged, and instructed, we cannot determine whether Appellant was convicted of possessing a "combination of parts," an actual "machinegun," or "poison gas" bombs. In this event, there is necessarily a defect of constitutional significance.

6

940 F.2d 107 (4th Cir. 1991) (quoting *United States v. Davis*, 313 F.Supp 710, 713 (D.Conn. 1970)) see also *United States v. Posnjak*, 457 F.2d 1110, 1116 (2nd Cir. 1972) ("All of the necessary components … must be possessed in order to possess a destructive device.").

### 1. The alleged PPSH "machinegun" (Counts 1 and 2)

No reasonable jury, properly instructed, could have found that the PPSH parts kit constituted a "machinegun" under any definition in § 5845(b). The undisputed record establishes that the seized item was nothing more than a cut-up box of surplus parts—an inert collection of metal fragments lawfully imported and sold for decades as non-firearms. (Pet. Br. at 24-25).

ATF's own witnesses conceded that the parts—whatever they were—were cut into multiple sections, that it could not chamber or fire a cartridge, and that substantial welding and machining would be required before any firing sequence was mechanically possible. (Pet. Br. Part II(c)(i)). The government's only contrary suggestion came from a confidential informant who speculated that "with Popsicle sticks and duct tape" he could make it fire (JA 513-14). They never bothered to try.

7

That distinction is dispositive. § 5845(b) reaches a "weapon which shoots, is designed to shoot, or can be readily restored to shoot," and "any combination of parts" from which such a weapon can be *assembled*. But nothing in the record supports that the PPSH parts kit "shot," was "designed to shoot," "could be readily restored" to do so, and certainly not simply "assembled" into such a weapon.

The evidence instead showed the exact opposite: that the kit was rendered permanently inoperable in accordance with long-standing ATF import guidance. For decades, ATF approved the importation and sale of identically cut PPSH kits as ordinary scrap metal or collector's items, without requiring registration. If the Bureau later changed its internal standard for how many cuts or which locations rendered a receiver unserviceable, that change was never promulgated through notice or communicated to unlicensed purchasers like Adamiak. He thus relied on the same understanding of legality that ATF itself had cultivated in the marketplace.

The government made no attempt to assemble the PPSH, and freely shifted with "each passing vicissitude of the trial and appeal" as to how the PPSH could be considered a machinegun, and the other parts

8

destructive devices. (Pet. Br. Part Ia) (quoting *Russell v. United States*, 369 U.S. 749, 768 (1962)). The NFA does not criminalize the ability of a skilled machinist to make a firearm from scrap metal; it punishes possession of a firearm or combination of parts that, as possessed, already falls within the statutory definition.

A properly instructed jury, understanding that welding and substantial fabrication falls outside § 5845(b)'s reach, could not have found guilt beyond a reasonable doubt. The only rational verdict on this evidence would have been acquittal.

### 2. RPG Launchers (Count 5)

No reasonable jury, properly instructed, could have found that the inert RPG-7 tubes constituted "destructive devices" within the meaning of 26 U.S.C. § 5845(f). The government's own proof established that the launchers were training aids—display pieces incapable of firing any projectile, let alone a rocket or explosive charge.

ATF's Exhibit 30 was plainly marked "TRAINING AID DUMMY." Both seized RPG tubes were sold and possessed as inert training aids, bore drilled holes, and lacked any fire-control assembly. The government's expert admitted that to "fire" a projectile, ATF replaced the

9

handgrip and trigger, inserted a 7.62 mm training insert, and fired a bullet—a caliber wholly unlike a rocket projectile. (JA849-50). No rational juror could find beyond a reasonable doubt that an RPG tube with holes and no trigger mechanism was a "destructive device." 26 U.S.C. § 5845(f)(1).

Each tube was stamped and painted with the markings "TRAINING AID – DUMMY" and bore multiple drilled holes through the pressure-bearing surface. (JA 2326; JA2317). Both lacked any fire-control assembly, trigger mechanism, or firing pin. ATF's own witness testified that attempting to use the objects as Appellant possessed them would "remove the user's head." (JA527). That testimony alone forecloses a finding that the items were "weapons" under § 5845(f)(1).

The government instead relied on what it called "functional testing," in which ATF engineers re-manufactured one of the tubes: they re-fitted it with a replacement handgrip and fire control assembly, inserted a 7.62 mm sub-caliber training device, and fired a bullet. (JA 2488-2504). That contrived demonstration proved only that ATF could transform a dummy launcher into an entirely different apparatus—a small-caliber firearm unrelated to anything defined in § 5845(f).

10

Section 5845(f) itself underscores why the evidence fails. None of the three prongs apply here. The RPG tubes were neither explosive nor incendiary devices; they were not "weapons" capable of firing any projectile; and there was no evidence of any "combination of parts" that could be readily assembled into one. At most, the record showed ATF's own combination of unrelated parts in a laboratory setting—far beyond what § 5845(f)(3) contemplates.

The government's theory thus depended on the same impermissible conflation rejected in *Staples* and *Thompson/Center*. How could Appellant have known of the features that made the weapon subject to the Act, when it wasn't so-subject until the government remanufactured it?

The only legally supportable conclusion on this record is that the RPG-7 tubes were non-functional training aids, not "destructive devices" within the scope of the National Firearms Act.

In *Blackburn*, this honorable court rightly observed that inert grenades which were simply missing powder could not be considered "destructive devices." *Blackburn*, 940 F.2d 107. It is uncontroverted here that Appellant's alleged RPG7s were missing critical components and

11

each contained a hole that would remove the user's face if it was used as a rocket projector. On this much, no reasonable jury, properly instructed, could have returned a conviction as to the RPG tubes.

### 3. M79 and M203 Receivers (Counts 3 and 4)

No reasonable jury, properly instructed, could have found that the M79 and M203 receivers constituted "destructive devices" within the meaning of 26 U.S.C. § 5845(f).

In the context of disassembled or knockdown items, it has been long understood that a "firearm," for NFA purposes, is only made where "the aggregated parts…can be used for nothing except assembling a[n NFA] firearm", *U.S. v. Thompson/Center Arms Co.* 112 S.Ct. 2102, 2106 (1992), or where an otherwise unregulated item is kept in such close proximity and in such a condition with parts that would render it a regulated firearm that the likelihood of lawful use "is belied by the utter uselessness of placing the converting parts with the others except for just such a conversion." *United States v. Kokin*, 365 F.2d 595, 596 (3rd Cir. 1966) (carbine together with all parts necessary to convert it into a machinegun is a machinegun), cert denied 385 U.S. 987 (1966); *United States v. Zeidman*, 444 F.2d 1051, 1053 (7th Cir 1971) (pistol and

12

attachable shoulder stock found in the same dresser constitute a shortbarreled rifle).

Evidence at trial suggested that the M79 and M203, as Appellant possessed them, were in no condition to justify a finding that they were "firearms" without completely overturning *Thompson/Center*. (Pet. Br. 42-43). Rather, we are dealing with a collector and re-seller who had "thousands of parts" all across his property. (JA499). A conviction is unsupportable as to Counts 3 and 4 due to a lack of evidence that the items were "weapons," and 2) even if parts to assemble a "weapon" existed, *Thompson/Center* and the rule of lenity preclude the statute's application here.

The government's theory again depended on post-seizure fabrication by ATF. In its testing, the agency assembled these receivers with 40 mm training barrels and cartridges that were never possessed by Adamiak, and only then did it achieve test-fire capability. (Pet. Br. Part IIe). The ATF's reconstruction created—for the first time—the NFA configuration the government attributed to Adamiak. As in *United States v. Thompson/Center Arms Co.*, 504 U.S. 505 (1992), the presence of lawful components capable of multiple configurations cannot support

13

conviction so long as a plausible lawful configuration exists. Here, the uncontroverted evidence showed the opposite: the M79 and M203 receivers were *in fact configured* as lawful 37 mm flare launchers and blank-barrel displays, configurations expressly outside § 5845(f). The mere fact that ATF later attached 40 mm barrels in its lab does not retroactively transform lawful possession into a felony.

The district court's instructions compounded this defect by reciting all three prongs of § 5845(f), including the "explosive, incendiary, or poison gas" clause, leaving jurors free to convict under a theory bearing no relationship to the evidence. A properly instructed jury, told that lawful receivers lacking explosive capability or intended assembly are not "destructive devices," could not have convicted. The evidence established, at most, the possession of display receivers lawfully purchased through the commercial market—not NFA firearms. As *Thompson/Center* makes plain, criminal liability cannot rest on the government's ability to manufacture a regulated configuration from otherwise lawful parts.

**B. The Indictment Was Indeed Defective.**

The panel asserted, and the government echoed, that a bill of particulars would have cured the indictment, "But it is a settled rule that

14

a bill of particulars cannot save an invalid indictment." *Russell v. United States*, 369 U.S. 749, 770 (1962). As explained *supra*, we cannot tell whether the grand jury or the petit jury based their conclusions on a valid basis. This is incompatible with a constitutionally sound judgment.

## C. The panel's affirmance conflicts with controlling Supreme Court and Circuit precedent.

By upholding convictions based on inert or incomplete items, the decision conflicts with *Staples, Thompson/Center*, and *Cargill*. Each requires that the government prove an item's present, functional characteristics—not speculative manufacturability or government-enabled assembly. "Readily restored" or "assembled" cannot mean "capable of being fabricated." The ruling also conflicts with decisions from other circuits limiting § 5845 to functional weapons or complete sets of parts, as fully laid out in petitioner's briefs.

## D. The error is outcome-determinative.

The statutory overbreadth of § 5845(b) and (f) makes the jury's verdict legally indeterminate. Both provisions contain multiple, disjunctive prongs—some directed at actual weapons, others at parts, and still others at explosive or even "poison gas" devices. See 26 U.S.C. § 5845(f)(1) (listing "any explosive, incendiary, or poison gas bomb,

15

grenade, rocket, missile, mine, or similar device"). The district court recited all of these definitions wholesale, without identifying which applied to the inert items at issue or requiring the jury to agree on a single definitional route. Thus, the jury could just as well have convicted under a wholly inapplicable theory—for example, by deeming a cut-up PPSH a "poison-gas bomb."

That definitional sprawl deprived Appellant of fair notice of what conduct the government deemed criminal and deprived the jury of the precision the law requires. Because the verdict may rest on an uncharged or legally impossible theory, it cannot stand. A properly instructed jury would have been told that each statutory clause carries distinct elements and that the government had to prove beyond a reasonable doubt that the object, as possessed, satisfied one specific clause of § 5845. None did.

Because no item in evidence could reasonably be a "weapon" as possessed by appellant, and each required fabrication to do so, the evidence was legally insufficient as a matter of law. The proper disposition is reversal and entry of judgment of acquittal.

## III. THE PANEL SHORT-CIRCUITED THE PRESERVED SECOND AMENDMENT CLAIM

16

The Second Amendment issue was raised several times in the proceeding below. (Pet. Br. Section VIII), and at no point did the government meaningfully engage with the Second Amendment as applied to the *actual items* Appellant possessed. Rather, throughout the entire appeal, the government ignored that the Second Amendment claim was explicitly as to the items Appellant possessed, and relied exclusively on decisions concerning *actual, operable* firearms. *See, e.g.* (Doc. 123).

The district court allowed the government to shirk its burden by applying pre-*Bruen* caselaw. The panel repeated this error by summarily asserting that machineguns and destructive devices are "beyond the scope" of the Amendment, pointing to *Bianchi*—which concerned operable firearms. There is simply no way that an assault weapon decision applies squarely to a case where it is undisputed that *nothing* appellant possessed, as he possessed it, could have harmed anyone.

This case therefore presents a distinct question of first impression for which a per curiam affirmance is inappropriate: whether the inert objects—whatever they are—that Appellant possessed fall within the Second Amendment's "unqualified command."

17

Because the court failed to apply *Bruen*'s standard or even acknowledge preservation of the issue, rehearing is required.

## IV. SENTENCING

Even if all counts survive, rehearing is warranted to correct the Guidelines error. In counting the firearms under U.S.S.G. § 2K2.1(b)(1)(A), a 6-level enhancement was applied to items completely unrelated to the base offense conduct.

The government included 28 items, which were not tried, in its offense level calculations. This was objected to at sentencing. (JA2157). The total number of firearms attributed was 33, this consisted of, to wit, the 5 "firearms" subject to the charge and conviction, 6 cut-up "receivers" purchased by the CI, and 22 other items seized by the ATF and claimed to be "firearms," which included air guns, and non-firing replicas. (JA1827; JA2171-75).

Additionally, the 15-level enhancements under 2K2.1 (b)(3) were inappropriate, as the commentary to Amendment 669 targets man-portable anti-aircraft systems—not nonfunctional souvenirs (JA849).

18

Under *United States v. Simmons*, 11 F.4th 239 (4th Cir. 2025), enhancements must reflect the actual offense conduct, not hypothetical potential supported only by the *ipse dixit* assertions of the government. None of the 28 items included had anything to do with the offense conduct. The panel's affirmance overlooked this clear sentencing error.

## V. CONCLUSION

The panel's decision rests on misapprehensions of both law and fact that expand the reach of the National Firearms Act and erode *Bruen*'s constitutional limits. Rehearing is essential to correct these errors and prevent recurrence in similar prosecutions. Appellant respectfully requests that this honorable Court grant this request for rehearing and rehearing *en banc*, vacate the panel's decision in part, and either (1) enter judgment of acquittal, or (2) remand for a new trial and resentencing consistent with the proper standards.

Respectfully submitted this 28th day of October, 2025,

/s/ Matthew Larosiere
The Law Office of Matthew Larosiere
6964 Houlton Cir,
Lake Worth FL 33467
Tel: (561) 452 7575
Larosieremm@gmail.com

## Certificate of Service

I certify that a copy of the foregoing was sent by CM/ECF on October 28, 2025, and notice of this filing was electronically served on all parties there registered for service.

/s/ Matthew Larosiere
*Counsel for Appellant Patrick Tate Adamiak*

## Certificate of Compliance

1) This document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 3,384 words.

2) This document complies with typeface requirements because it has been prepared in a proportional spaced typeface using Microsoft Word in 14-point Century Schoolbook font.

Respectfully submitted,

*/s/ Matthew Larosiere*

*Counsel for Appellant Patrick Tate Adamiak*